**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CHRISTOPHER PAIGE and | ) | Chapter 7 |
| MICHELE PAIGE, | ) | |
| | ) | Case No. 5:11-bk-05957-JJT |
| Debtors | ) | |
| | ) | Claim 3-1 |
| | ) | |
| | ) | |
| CHRISTOPHER PAIGE, and | ) | Debtors' |
| MICHELE PAIGE | ) | Objection to |
| | ) | LMF's Proof of Claim |
| Movants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LMF, | ) | |
| | ) | |
| | ) | |
| Respondents, | ) | |
| | ) | |

### REPLY BRIEF IN SUPPORT OF
### DEBTORS' OBJECTION TO LERNER MASTER FUND, LLC'S PROOF OF
### CLAIM AGAINST CHRISTOPHER PAIGE

Frankly, LMF's Answer of Lerner Master Fund, LLC to Debtor's Objection to

Proof of Claim against Christopher Paige (hereinafter "LMF's Answer")[1] is

incomprehensible because it fails to cite a single legal authority for any of its

extraordinary legal propositions.[2] Apparently, LMF believes that the Chancery Court's

---

[1]  Since LMF's Answer of Lerner Master Fund, LLC to Debtors' Second Objection to
Proof of Claim Against Christopher Paige (hereinafter "Second Answer") is not
substantive, this Reply Brief applies with equal force to LMF's Second Answer. *See
generally* LMF's Second Answer (expressly denying any substantive purpose and relying
instead upon Lerner's Answer).

[2]  Indeed, the *only* citation to *any* legal authority in either of LMF's filings on April 9,
2012, was a single reference to the Local Rule 3007-1 on page 2, footnote 2 of LMF's

1

Judgment adjudicated its fiduciary duty claim while magically preserving its claims for unjust enrichment and aiding and abetting a breach of fiduciary duty. *See, e.g.*, LMF's Motion for Relief from Automatic Stay (hereinafter "Motion for Relief"), p. 4, ¶ 10 (conceding that Chancery Court adjudicated LMF's fiduciary duty theory); *and* LMF's Answer, p. 3, ¶¶ 1-2 (purporting to limit LMF's new action to "new" claims that have "yet to be tried"). Yet, LMF's argument flies in the face of Delaware's transactional approach to *res judicata*. To quote Delaware's Supreme Court:

> "Res judicata exists to provide a definite end to litigation, prevent vexatious litigation, and promote judicial economy. **The procedural bar of res judicata extends to all issues which might have been raised and decided in the first suit as well as to all issues that actually were decided.** In essence, the doctrine of res judicata serves to prevent a multiplicity of needless litigation of issues **by limiting parties to one fair trial of an issue or cause of action which has been raised or should have been raised in a court of competent jurisdiction.**"
>
> LaPoint v. AmerisourceBergen Corp., 970 A.2d 185, 191-192 (Del. 2009) (internal citations omitted) [emphasis added].

LMF does not even allege the existence of any *legal* impediment to raising its "new" claims at the first trial; to the contrary, LMF claims, "Presentation of new evidence in the Chancery Court is therefore not necessary." Reply Brief in Support of Lerner's Motion for Relief from the Automatic Stay, p. 8. Ironically, LMF claims it was entitled to destroy evidence because, "Presentation of new evidence in the Chancery Court is therefore not necessary." Id. If res judicata does not prevent re-trials on "old" facts in support of "new" theories, then it prevents nothing at all.

Bizarrely, LMF's interpretation of the Chancery Court's Judgment ignores its own evidence in its own Motion for Relief! On page 5, Para. 12 of LMF's Motion for

---

Answer. Since LMF still has not bothered to serve me with its Proof of Claim, it remains unclear why I had to file a Notice of Objection. Regardless, I did so on April 10, 2012. In short, LMF's only legal authority relates to an ancillary moot point.

Relief from the Automatic Stay, LMF quotes Chancellor Strine as follows: "I stand by that decision and if I were to change it, it would be to allow the Lerner Fund to amend and add new counts and to ask me to find that the factual findings in the opinion satisfy those new theories and justify the imposition of monetary damages against Christopher Paige." That is, Chancellor Strine expressly stated that he would need to **change** his Opinion to allow LMF to add new counts, so how in the world can LMF argue that his **un-changed** Opinion permits re-pleading? If Chancellor Strine didn't think his Opinion permitted re-pleading, then why are we here? LMF has not cited a single authority in support of its bizarre theory that parties can re-litigate old facts in support of new legal theories, and LMF literally cited Chancellor Strine in opposition to its bizarre theory, so what are we arguing about?

Regardless, it is black-letter law in Delaware that a dismissal without prejudice is a final judgment unless the trial court *expressly permits re-pleading within a time certain.* Braddock v. Zimmerman, 906 A.2d 776, 783-784 (Del. 2006) [emphasis added]. *See also* 1-14 Corp & Commercial Practice in DE Court of Chancery § 14.02 ("An order of the Court of Chancery dismissing a complaint with prejudice is final in nature and therefore appealable. The Supreme Court has clarified, moreover, that even a dismissal without prejudice is a final judgment for purposes of an appeal, 'unless the plaintiff is expressly granted leave to amend.'"). Since LMF does not dispute these authorities, LMF necessarily – albeit implicitly – concedes that the Chancery Court's Judgment is a <u>final</u> judgment *in my favor.*[3] *See, e.g.,* Claim 3-1, Exhibit A, ¶ 6 (failing to expressly grant

---

[3]   Chancellor Strine's speculations regarding issues not before him are a textbook example of dicta, which has no preclusive effect. *See, e.g.,* Schoon v. Troy Corp., 2006 Del. Ch. LEXIS 136, 3 (Del.Ch. 2006) (holding that dicta has no preclusive effect.)

3

permission to re-plead and failing to set a time certain), *and see generally* LMF's Answer (failing to cite any contrary authority). Likewise, Delaware law distinguishes between dismissals, which are final, and dismissals coupled with stays, which are not. Draper v. Gardner Defined Plan Trust, 625 A.2d 859, 860 n.1 (Del. 1993). Here, LMF does not even allege the Chancery Court stayed its proceedings in any way.

Besides, it is undisputed and indisputable that Delaware law does not permit dismissals without prejudice *after* trial. *See, e.g.* Draper v. Gardner Defined Trust Plan, 625 A.2d 859, 863-4 (Del. 1993); In re Marriott Hotel Props. II Ltd. Pshp. Unitholders Litig., 1997 Del. Ch. LEXIS 128, 18-9 (Del. Ch. 1997); ASX Inv. Corp. v. Newton, 1994 Del. Ch. LEXIS 66, 7 n. 3 (Del. Ch. 1994) (prohibiting dismissals without prejudice after defendant has incurred substantial trial preparation costs). LMF does not even attempt to explain how or why Chancellor Strine could reverse and/or modify these authorities, much less how he could have done so implicitly and – based on LMF's own evidence - unintentionally. *See* LMF's Motion for Relief, p. 5. ¶12.

Although this Court cannot evaluate the merits of the Chancery Court's decision or divine Chancellor Strine's intentions, it must evaluate the merits of LMF's interpretation thereof because this Court determines the preclusive effect of state court judgments. *See, e.g.*, In re Brown, 951 F.2d 564, 568 (3rd Cir. 1991) (holding that bankruptcy courts determine preclusive effect of state court judgments using law of state in which judgment issued). In other words, the preclusive effect of the Chancery Court's Judgment is a question of law for this Court, not a question of fact for Delaware's courts. At best, LMF claims that Chancellor Strine intended to create new law reversing and/or modifying the aforementioned authorities - new law that he promptly forgot to mention in

4

his Judgment and expressly denied in his post-Opinion letter! *See* Motion for Relief, p.5, ¶ 12.

Besides, LMF's Answer ignores an undisputed and indisputable fact: LMF represented to us that all litigation between the parties ended sometime before October 28, 2011, when it admits that it attained a court order that compelled us to destroy evidence based upon that representation. *See, e.g.*, Exhibit A (LMF email), Exhibit B (Court Order), *and* LMF's Reply Brief in Support of Motion for Relief from Automatic Stay, pp. 7-8. LMF does not even attempt to explain how or why it believes that a party who has attained a court order based upon its representation that all litigation has ended could renew that same litigation months later. Even if we were to ignore the aforementioned estoppel issue, LMF does not even attempt to explain how or why its delay would not constitute laches. That is, LMF literally argues – and asks this Court to rule – that a dismissal without prejudice **after** trial entitles a party to present "new" legal arguments whenever the mood strikes, even if it has previously represented the litigation is over and persuaded a court to order the destruction of evidence based upon that representation.

By failing to address any of these legal issues with contrary authorities, LMF necessarily – albeit implicitly – adopts our legal authorities as its own.[4] Indeed, a party often reveals its true character through its complaints. Here, LMF is outraged that I filed my bankruptcy petition promptly. *See* LMF Answer, p. 2. Apparently, LMF believes that I should have "aged" my filings just like LMF does. *See, generally*, LMF's Motion

---

[4]    To the extent LMF attempts to flout our rights by some belated filing filled with new legal authorities, we respectfully reserve the right to a reasonable opportunity to research and respond to LMF new-and-improved theories.

to Extend Deadline to Determine Dischargeability; Transcript of 3/1/12; LMF's Response to Debtors' Motion to Dismiss and/or Strike LMF's Untimely Filings, p. 21, n 7 (where LMF repeatedly admits to waiting six (6) additional days after waiting seventy-two (72) days on a sixty (60) day deadline merely because it considered prompt filing "unimportant"). Likewise, LMF complains that I filed my Objection promptly, rather than raising the defect of service issue with them first. *See* LMF Answer, p. 3, n. 4. Never mind that I asked LMF to correct a previous defect in service at this Court's hearing on March 1, 2012, and LMF refused. Transcript of 3/1/12. And never mind that LMF still hasn't bothered itself to serve me with its Claim! Lerner's Answer, p. 2 (standing pat on Certificate of Service).

Apparently, LMF believes that acting quickly to preserve one's legal rights is bad form, and they've certainly practiced what they preach! At best, LMF admits they learned of the Chancery Court's Opinion on August 8, 2011. *See* LMF's Answer, p. 2. So when did they attempt to renew litigation? January 10, 2012. *See, e.g.*, LMF's Renewal of Motion for Relief from the Automatic Stay, p. 2, ¶1. Of course, the automatic stay cannot explain why LMF did nothing during the twenty-one (21) days following the Chancery Court's Opinion on August 8, 2011, and preceding our bankruptcy filing on August 29, 2011. Likewise, the automatic stay cannot explain why LMF waited four and a half (4.5) months after our bankruptcy filing to seek relief from the automatic stay. Although the automatic stay cannot explain either LMF's pre-bankruptcy delay or its post-bankruptcy delay in seeking relief, something else can: it is undisputed and indisputable that LMF did not learn we had complied with its demand that we destroy our evidence until January 6, 2012. *See* Exhibit C (transcript), p. 68,

L:16-22. Just four days later, they *finally* sought relief from the automatic stay. Maybe that's just a coincidence, and maybe the Pittsburgh Pirates won't lose another game all season.

Besides, how – exactly – does LMF intend to proceed? Are we going to spend the next year or two fighting a second trial and appeal in Delaware while this Court stays my bankruptcy indefinitely? Or are you going to opine on whether or not my debt would be dischargeable *before* we know whether or not that debt exists? Or is LMF claiming that I've already been found guilty of claims that have "yet to be tried"? *See* LMF's Answer, p. 3, ¶ 2. That somehow pleading those "new" claims was a pre-requisite to a Judgment, but not a pre-requisite to an Opinion definitively adjudicating those claims? Are we to believe that Delaware has adopted the judgment first, pleadings later approach to jurisprudence popularized in Kafka's The Trial?

In the final analysis, the legal question is simple: how many times can Delaware re-try me for the same transaction? After all, this Court has no way of knowing that a second trial won't end like the first; consequently, this Court must decide where Delaware law draws the line on trials. For the last nine hundred years, Anglo-American jurisprudence has drawn that line at one (1) trial per transaction. *See, e.g.,* LaPoint v. AmerisourceBergen Corp., 970 A.2d 185, 191 (Del. 2009) (tracing *res judicata* doctrine to twelfth century). LMF has not proffered any authority for extending that line to two (2) trials. To be clear, our point is not that LMF cannot argue that a dismissal without prejudice is not a final judgment for the purposes of claim preclusion;[5] rather, our point is

---

[5]    According to Delaware's Supreme Court: "The phrase 'without prejudice' in an order of dismissal by a Delaware judge is not to be construed as an implicit invitation to file an amended complaint. Instead, the phrase 'without prejudice" will mean only that the

that LMF cannot deny that such a dismissal would be a final judgment for the purposes of claim preclusion while simultaneously claiming it is a final judgment for the purposes of issue preclusion. Likewise, LMF cannot claim that a dismissal without prejudice is a final judgment for the purposes of destroying evidence while simultaneously arguing it is not a final judgment for the purposes of *res judicata*. Finally, LMF cannot re-try me after it has represented to us and the Chancery Court that all litigation has ended. *See, e.g.,* Exhibit A (LMF email), Exhibit B (Court Order). In other words, LMF expressly and implicitly waived its right to resume litigation, even assuming *arguendo* that it had such a right.

## I.    A Point-by-Point Response to LMF's Answer

For convenience, I will respond point-by-point to LMF's Answer:

1.    Although LMF insists it can re-try me, Delaware law disagrees. It is undisputed and indisputable that this Court determines the preclusive effect of the Chancery Court's Judgment, and it is undisputed and indisputable that this Court makes that determination under Delaware law. *See, e.g.,* In re Brown, 951 F.2d 564, 568 (3rd Cir. 1991) (holding that bankruptcy courts determine preclusive effect of state court judgments using law of state in which judgment issued). Unfortunately for LMF, Delaware follows the

---

otherwise final judgment does not operate as a res judicata bar to preclude a subsequent lawsuit on the same cause of action." Braddock v. Zimmerman, 906 A.2d 776, 784 (Del. 2006). Thus, Delaware's Supreme Court expressly considered and expressly rejected LMF's "implicit" invitation argument. To be clear, Delaware's Supreme Court does not permit dismissals without prejudice after trial, so Delaware's Supreme Court never anticipated the interplay between finality for the purposes of issue preclusion and finality for the purposes of claim preclusion created by Chancellor Strine's unlawful Opinion. Nevertheless, LMF must pick a theory and stick with it. If LMF claims Chancellor Strine's Opinion is final for issue preclusion, then it's final for claims preclusion. Otherwise, we might as well start over here. More to the point, LMF simply cannot explain its previous representation that all litigation had ended and its destruction of evidence in what – according to LMF's theory – would be "pending" litigation.

Case 5:11-bk-05957-RNO    Doc 104    Filed 04/23/12    Entered 04/25/12 13:30:45    Desc
Main Document      Page 8 of 60

transactional approach to *res judicata*. *See, e.g.*, LaPoint v. AmerisourceBergen Corp., 970 A.2d 185, 191-192 (Del. 2009). Likewise, Delaware law simply does not allow dismissals without prejudice *after* trial. *See, e.g.* In re Marriott Hotel Props. II Ltd. Pshp. Unitholders Litig., 1997 Del. Ch. LEXIS 128, 18-9 (Del. Ch. 1997); ASX Inv. Corp. v. Newton, 1994 Del. Ch. LEXIS 66, 7 n. 3 (Del. Ch. 1994). If a dismissal without prejudice *after trial preparation* alone may constitute "plain legal prejudice," then one cannot imagine a more obvious example of "plain legal prejudice" than a dismissal without prejudice *after* a trial, post-trial briefs, post-trial arguments and a one hundred (100) page Opinion. Besides, LMF's post-trial destruction of evidence in and of itself constitutes plain legal prejudice. *See, e.g.*, NVF Co. v. New Castle County, 276 B.R. 340, 356-7 (D. Del. 2002) (to constitute prejudice, lost testimony need only be helpful because court will not speculate about the inherently unknowable value of lost evidence).

Under Delaware law, LMF's only remedy for the Chancery Court's "erroneous" dismissal was an appeal. *See, e.g.*, Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC, 27 A.3d 531, 535 (Del. 2011) (granting unsuccessful plaintiff's appeal of Chancery Court's dismissal without prejudice); Draper v. Gardner Defined Plan Trust, 625 A.2d 859, 860 n1 (Del. 1993) (holding that dismissal without prejudice is final, but dismissal with stay was not). And LMF waived that remedy. *See, e.g.*, Exhibits A & B. Once again, to quote the Delaware Supreme Court,

> "We hold that a final judgment results, for purposes of appeal in Delaware, whenever a complaint is dismissed without prejudice *unless the plaintiff is expressly granted leave to amend within a time certain.*
>
> > Braddock v. Zimmerman, 906 A.2d 776, 783-784 (Del. 2006) [emphasis added].

Case 5:11-bk-05957-RNO    Doc 104    Filed 04/23/12    Entered 04/25/12 13:30:45    Desc
Main Document    Page 9 of 60

Since LMF does not even allege that the Chancery Court set a time certain for it to renew its litigation against me, the Chancery Court's dismissal was a final judgment *in my favor* under Delaware law.[6] Significantly, LMF cites no authority to the contrary.

2. Does the U.S. Constitution allow states to re-try the same party on the same facts in support of a different legal theory? Although LMF apparently believes the answer is "yes," this Court does not need to reach that Constitutional question because Delaware law does not permit LMF to re-try me on the same facts in support of its new legal theories. *See, e.g.*, LaPoint v. AmerisourceBergen Corp., 970 A.2d 185, 191-192 (Del. 2009). Assuming *arguendo* that Chancellor Strine overturned Delaware's Supreme Court *sub silentio*, his new interpretation of *res judicata* would violate the U.S. Constitution's Due Process clause. To put it another way, if – as LMF claims – the Due Process clause allows states to re-try the same party on the same facts in support of different legal theories, precisely how many times could a state re-try someone? Would the U.S. Constitution allow Delaware to re-try me twice? Three times? As often as it likes? Unless LMF claims the U.S. Constitution permits states to re-try people *ad infinitum*, LMF necessarily – albeit implicitly - concedes the Constitution limits re-trials. Does LMF have any proof whatsoever that the Constitutional limit is greater than one (1) trial per transaction? If not, then what are we arguing about?

3. LMF's personal jurisdiction theory is facially ludicrous. LMF has already attained a court order expressly stating that all litigation between us has ended, so how

---

[6]    Although – at first blush – this result may seem odd, it's really logically necessary. Otherwise, a trial court could avoid appellate review by simply labeling all of its decisions "dismissals without prejudice." The "prevailing" party would not be able to appeal because it prevailed, and the losing party would be unable to appeal because the judgment would not be final. Consequently, Delaware's Supreme Court acknowledged the fact that the substance of a decision – rather than its nomenclature – must control.

Court blithely adopted a rule that threatens to eviscerate the attorney-client relationship as applied to fiduciaries without bothering to hear arguments or mention that sweeping decision in its Judgment. Significantly, a trial cannot "correct" or "remedy" these inherent conflicts between permitting LMF's Claim to proceed and the nature of the attorney-client relationship because fiduciaries would still need to find attorneys who were ready, willing and able to finance litigation against disgruntled "victims" of their clients. Call me crazy, but I don't think Chancellor Strine launched a frontal attack on the attorney-client relationship *by implication*! It's simply more logical and more consistent with sound jurisprudence to hold that LMF frittered away its chance to test the meaning of Chancellor Strine's Judgment than it would be to permit LMF to impose a five (5) month delay for no particular reason.

**This is not a law school exam; our goal is not to adopt the legal interpretation that creates the most legal issues.** Here, the undisputed and indisputable fact is that all of these problems and issues are solely the result of LMF's voluntary delays and its unexplained and inexplicable reversals. Nobody told LMF to claim the litigation was over, and nobody told LMF to wait until January 2012 to seek relief from the automatic stay, so LMF – and LMF alone – should live with the consequences of its decisions.

6. The case is moot because I know what assets I own, and I don't own any non-exempt assets. The case is moot because the Trustee's Attorney told me it's moot. Besides, the Trustee's Attorney stated on the Record that the assets at issue are – at best – less than the priority debts on my filing. Transcript of 3/1/12. And this Court can take judicial notice of the fact that litigation costs will consume much of anything the Trustee eventually recovers anyway. Transcript of 3/1/12. Besides, what the Trustee thinks he

15

are they going to reverse that position now? *See, e.g.*, Exhibits A & B. If, as LMF claims, our Delaware litigation remains pending, then why on earth were they destroying any evidence relevant to a pending litigation? *See, e.g.*, <u>Beard Research, Inc. v. Kates</u>, 981 A.2d 1175, 1185 (Del. Ch. 2009) ("A party in litigation or who has reason to anticipate litigation has an affirmative duty to preserve evidence that might be relevant to the issues in the lawsuit"). Besides, how did LMF know what evidence "might be relevant" to the issues in our lawsuit since LMF didn't even know which, if any, theories it would pursue? *See, e.g.*, Transcript of Hearing 1/5/12, p. 8, L: 6-7; LMF's Response to Debtors' Motion to Dismiss and/or Strike LMF's Untimely Filings, p. 18 (claiming LMF did not know which theories, if any, it would pursue). According to Chancellor Strine:

> **"A party in litigation or who has reason to anticipate litigation has an affirmative duty to preserve evidence that might be relevant to the issues in the lawsuit."** Often, this duty attaches even before litigation has been commenced "when a party should have known that the evidence may be relevant to future litigation." A party does not, however, have a duty to "preserve every shred of paper, every e-mail or electronic document," but instead must **"preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request."**

> <u>TR Investors, LLC v. Genger</u>, 2009 Del. Ch. LEXIS 203 (Del. Ch. 2009) (internal citations omitted) [emphasis added].

It's rare that someone uses potentially criminal activity as a defense to an Objection to Proof of Claim, but the fact that LMF now claims to have willfully and deliberately destroyed evidence in a pending litigation by lying to the Chancery Court about the status of that litigation should demonstrate the frivolity of LMF's theory.

4. Even if LMF only wanted to destroy some evidence, why were they destroying any evidence at all? Throughout his Briefs, Mr. Goodchild likes to make fun of my Yale Law School education. I think that's a little childish, but he's entitled to his intellectual

11

insecurities. That said, I certainly never heard of a theory that permits a party to destroy "some" evidence in a pending litigation, and Mr. Goodchild provides no logical or legal support for his claim that parties can destroy any evidence they deem "immaterial." Second, Mr. Goodchild's claim is factually false: we told LMF that we would have to destroy all of our evidence in order to comply with its demand, and LMF told us to proceed. To be clear, I'm not accusing Mr. Goodchild of lying, but he simply doesn't know the contents of conversations between Brown Rudnick (our former counsel) and LMF's other attorneys. Third, Mr. Goodchild's claim is irrelevant: LMF is responsible for any actions we took in reasonable reliance upon its instructions, regardless of its subjective intent. Here, LMF expressly demanded that we destroy copies in the possession of our attorneys and consultants. *See* Exhibit A. Clearly, LMF did not expect those professionals to work for free, nor could LMF expect us to finance their manual search through millions of pages to find and destroy LMF's evidence and only LMF's evidence. When LMF asked us - two bankrupts - to direct outside firms to destroy evidence, LMF necessarily consented to destruction by the cheapest means available.[7]

5. According to LMF, they're not suing me in my role as a husband. Rather, LMF is suing me because I was "intimately involved" in my wife's decisions. LMF Motion for Relief, p. 4, ¶ 11. In other words, LMF's legal theory – quite literally – is a sexist pun. One might as well sue an African-American for "an innate propensity towards crime" or a Mexican-American for "inherited laziness." Other than LMF's sexist assumption that a

---

[7]     As this Court knows, my wife and I have serious and expensive health problems; consequently, no reasonable person could or would expect us to use our limited resources to pay professionals to selectively destroy documents, thereby endangering our health on the off chance that LMF might renew litigation at some later date despite its representations – and a Chancery Court Order - to the contrary.

woman is incapable of making a decision without her husband's "intimate involvement," what – exactly – did I supposedly do? Regardless, "intimate involvement" is sexism, not a legal theory, and LMF's attempt to enshrine its sexist fantasies about women and their decision-making capacity into law certainly doesn't enable this Court to distinguish between LMF's "old" and "new" theories.[8]

Besides, LMF can't sue me in my role as an attorney because LMF's emails – the very documents LMF destroyed – repeatedly refer to me as Michele's lawyer. In other words, my role as an attorney is part of their "old" theory. Likewise, in trying to describe its "new" theory, LMF still claims that my wife and I jointly-managed the funds, which was also part of LMF's "old" theory. (After all, why would one joint-manager have a fiduciary duty while her alleged partner did not?) Meanwhile, I did not own any of the corporate entities at issue, and I did not have the legal authority to prevent and/or override any of my wife's decisions, which is – presumably – why I won the first trial. So what form of "involvement" creates my liability to LMF without repeating any of LMF's "old" theories? Here, LMF seeks only to re-argue old facts in support of new legal theories, but *res judicata* is transactional – *res judicata* requires LMF prove the existence of some *legal* impediment to pursuing its theories at the first trial.[9]

Stranger yet, LMF asserts that the Chancery Court attempted to condition LMF's

---

[8]    If, as LMF apparently claims, Delaware extends liability to anyone who merely advises a fiduciary, then LMF's tort laws would conflict with the First Amendment. Rather than create a Constitutional question merely to accommodate LMF, this Court should simply find the obvious: "concerted action" requires more than mere advice. Here, the only "concerted action" to which LMF points is sexual intercourse, via its sexist pun.

[9]    LMF's failure to present a particular legal theory did not magically preserve that legal theory for another day; rather, LMF has to explain why it could not present that legal theory at the first trial. *See, e.g.,* LaPoint v. AmerisourceBergen Corp., 970 A.2d 185, 191-192 (Del. 2009).

renewal of litigation against me upon my wife's ability to pay LMF. *See, e.g.*, LMF's Motion for Relief from Automatic Stay, pp. 4 -5, ¶¶ 11, 15. That condition is utterly bizarre – why would LMF's ability to sue me as an alleged joint-tortfeasor depend upon my alleged co-conspirator's ability to pay? Worse yet, that "condition" creates a conflict between state law and federal bankruptcy law. *See, e.g.*, Perez v. Campbell, 402 U.S. 637, 649-50 (1971) (prohibiting states from passing laws that deny a "fresh start" to debtors). In effect, LMF's interpretation of the Chancery Court's Judgment punishes us for our bankruptcy by creating a new potential liability. To be clear, I don't claim that it would be impossible to resolve that conflict, but that's just not how jurisprudence works: this Court simply does not assume that the Chancery Court created a conflict between federal bankruptcy law and state tort law merely because creating – and resolving – that conflict would be convenient for LMF.

Indeed, LMF's Claim is particularly problematic as it seeks to hold me accountable for allegedly erroneous legal advice that I offered to my wife. To the extent my wife's testimony contradicted LMF's evidence, LMF – quite literally – seeks to require every attorney to assume his or her client is wrong or run the risk of incurring a non-dischargeable debt, a rule that literally deprives fiduciaries of their right to zealous advocacy. *See, e.g.*, ABA Model Rules of Professional Conduct, Rule 3.1 (permitting attorneys to advance all non-frivolous arguments). More generally, LMF claims that my advice to my wife should have been governed by some duty to LMF, a rule that literally deprives fiduciaries of independent legal advice. *See, e.g.*, ABA Model Rules of Professional Conduct, Rule 1.7(a)(2) (holding that a lawyer cannot accept representation when duty to client conflicts with duty to others). Here, LMF argues that the Chancery

can get is usually larger than what he can actually get, so the fact that LMF won't recover even under the "best case" scenario renders its Claim moot.

Ironically, LMF asserts its Claim is not moot because they're suing me for non-dischargeability. If this is really about non-dischargeability, then why would we send this matter to Delaware to allow that state's courts to opine on *dischargeable* debts? Shouldn't this Court simply adjudicate both LMF's Proof of Claim and its non-dischargeability Complaint? *See generally* Debtors' Oppositon to LMF's Renewed Motion for Relief from Automatic Stay.

## II. The Equitable Doctrines of Estoppel and Laches Precludes LMF's Proof of Claim.

As a matter of equity, LMF's conduct constitutes estoppel. According to Delaware's Supreme Court:

> **"It is also well settled in Delaware that a party maybe estopped from asserting her rights.** We have explained that estoppel applies when a party by his conduct intentionally or **unintentionally** leads another, in reliance upon that conduct, to change position to her detriment. To establish estoppel, the party claiming estoppel must show the following three elements: (1) she lacked knowledge or the means of obtaining knowledge of the trust of the fact in question, (2) she relied upon the conduct of the party against whom estoppel is claimed, and (3) she suffered a prejudicial change of position as result of her reliance."

> Bantum v. New Castle County Vo-Tech Educ. Ass'n, 21 A.3d 44, 51 (Del. 2011) (internal citations omitted) [emphasis added].

Apparently, none of these elements is in dispute. At best, LMF asserts the evidence it destroyed was "immaterial." Huh? If the first trial was "final" for the purposes of issue preclusion, then *res judicata* precludes a second trial. If the first trial was not "final" for purposes of issue preclusion, then how can anyone know this evidence would not affect a second trial at which I would be permitted to re-litigate every issue? Are we simply

going to take LMF's word for the proposition that this evidence would not have mattered? And how did LMF know in October 2011 what evidence would be "material" even though it still had not decided what, if any, theories to pursue on December 6, 2011? *See, e.g.*, LMF's Motion to Extend Deadline to Determine Dischargeability; Transcript 3/1/12 (claiming LMF did not know whether or not it would sue and/or what theories it would use). Besides, as noted above, a party's duty to preserve evidence extends far beyond a duty to preserve "material" evidence, and who knows where LMF's evidence might have led? *See, e.g.,* TR Investors, LLC v. Genger, 2009 Del. Ch. LEXIS 203 (Del. Ch. 2009).

As a matter of equity, LMF's actions constitute the epitome of laches. *See, e.g.,* In re Serubo, 1994 Bankr. LEXIS 229, 29 (Bankr. D. Pa. 1994) (laches generally applies in bankruptcy) (internal citations omitted). Under Delaware law, the elements of laches are as follows:

> "The Delaware Supreme Court has stated that "the essential elements of laches are: (i) plaintiff must have knowledge of the claim and (ii) there must be prejudice to the defendant arising from an unreasonable delay by plaintiff in bringing the claim. Fike v. Ruger, 752 A.2d 112, 113 (Del. 2000)."

> NVF Co. v. New Castle County, 276 B.R. 340, 354 (D. Del. 2002).

Here, LMF cannot seriously claim ignorance of its claim against me, and – for the reasons outlined below – LMF cannot seriously dispute the prejudice it inflicted upon me.

Now far be it from me to deny a party's ability to disavow an attorney's unauthorized actions, but LMF doesn't claim its attorney's email of October 28, 2011, was unauthorized. To the contrary, LMF reaffirmed that email in this Court. *See, e.g.,* LMF's Reply Brief in Support of Motion for Relief from the Automatic Stay, pp. 7-8. So, really, what is LMF arguing? That representing to us and the Chancery Court that the

litigation was over has no effect on their ability to resume litigation? And, remember, this is the same LMF that's trying to resume litigation in Delaware, so it's not like they're claiming that their representations that all litigation had ended were somehow limited to Delaware litigation alone. *See, generally,* LMF's Motion for Relief & Renewed Motion.

Since LMF admits that I relied upon its representations to my detriment, why are we here? Is LMF aware of some previously unknown exception to estoppel and/or laches that allows LMF to retroactively repudiate its previous representations that all litigation has ended after I have destroyed evidence in reliance upon those representations? Is LMF aware of some previously unknown legal principle that permits a party who has attained a court order premised on the termination of all litigation to subsequently renew litigation months later? I don't mean to be cute, but why are we struggling with so many complicated issues merely because LMF can't seem to file anything on time?

### III. Conclusion

At some point, this Court cannot turn a blind eye to LMF's propensity for "convenient" mistakes. I mean, really, can anyone believe it's just a "coincidence" that LMF first learned we had destroyed our evidence on January 6, 2012, and that LMF first attempted to resume litigation against me on January 10, 2012? Can anyone really believe it's just a "coincidence" that LMF approached Brown Rudnick to inquire about our destruction of evidence on December 5, 2011, just one day before the filing deadline? Can anyone really believe it's just a "coincidence" that LMF testified to the existence of a bizarre conspiracy between its attorney and my former counsel whereby she traded my rights for their silence to benefit her reputation? And, even assuming *arguendo* these are "coincidences," why should I suffer as a result? Even assuming *arguendo* that this Court

trusts Mr. Goodchild implicitly, will this Court trust everyone who may be inclined to imitate him?

Mr. Goodchild is a clever man, and clever men can justify anything, but no reasonable, fair-minded person familiar with these facts would be anything, but appalled if this Court were to permit LMF to proceed. It's time for this case to end because LMF has – at best – acted with flagrant disregard for its responsibilities under the law, our rights, and fundamental fairness. More realistically and more accurately, LMF has repeatedly and deliberately deceived us, the Chancery Court and this Court in order to gain illicit advantages. Ultimately, however, there's simply no reason I should suffer for LMF's voluntary delays and retractions of its representations to us, the Chancery Court and this Court, even if all of LMF's "mistakes" really are just mistakes.

For nine hundred years, Anglo-American jurisprudence has limited parties to one (1) trial per transaction. *See, e.g.*, LaPoint v. AmerisourceBergen Corp., 970 A.2d 185, 191 (Del. 2009) (tracing *res judicata* doctrine to twelfth century). Bankruptcy courts have enforced that principle without controversy and without remanding proofs of claim to state courts. *See, e.g.*, In re Brown, 951 F.2d 564, 568 (3rd Cir. 1991). If we are going to modify and/or reverse those time-honored principles for LMF's benefit, shouldn't we – at the very least – expect LMF to cite at least one contrary authority and to act expeditiously and to refrain from destroying evidence during its voluntary delays?

**WHEREFORE**, Debtors respectfully request this Court deny LMF's Proof of Claim in its entirety.

Dated: April 23, 2012

Respectfully submitted,

Chris Paige, Debtor
Pro Se

Michele Paige, Debtor
Pro Se

20

## CERTIFICATE OF SERVICE

Under penalty of perjury, we hereby affirm that we served a true and correct copy of the foregoing Reply Brief in Support of Debtors' Objection to Lerner Master Fund, LLC's Proof of Claim Against Christopher Paige and Exhibits upon the persons and parties indicated below via first-class U.S. Mail, postage pre-paid:

John Goodchild, Esq.
Melina R. Foote, Esq.
Morgan Lewis
1701 Market Street
Philadelphia, PA 19103-2921

Chris Paige, Debtor
Pro Se

Michele Paige, Debtor
Pro Se

Dated: April 23, 2012

Bill, Jeff and Dan,

I am writing on behalf of Lerner Master Fund and Brooklyn New York Holdings to request that your clients (Paige Capital Management, LLC, Paige Opportunity Partners, L.P., Paige Opportunity Master Fund, Ltd., Paige GP, LLC, Michele Paige, and Christopher Paige) destroy all Confidential and Highly Confidential Discovery Material produced by my clients in the Delaware Chancery Court civil action no. 5502-CS, and provide us with a written certification of destruction. Our request also applies to law firms, experts, document management vendors, client affiliates, and anyone else associated with your side during the litigation that received my clients' Confidential or Highly Confidential Discovery Material.

We are making this request pursuant to Paragraph 18 of the Stipulation and Order Governing the Production, Exchange and Filing of Confidential Material dated September 2, 2010, subject to the other terms of that order.

Let me know if it would be helpful to discuss by phone.

Christopher E. Duffy
Boies, Schiller & Flexner LLP
575 Lexington Avenue
New York, New York 10022
212-446-2366 (direct line)
CDuffy@BSFLLP.com

IRS Circular 230 disclosure:
To ensure compliance with requirements imposed by the IRS, unless we expressly state otherwise, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

business days after the receipt of the official transcript of such proceeding, provided that all testimony, exhibits and transcripts of depositions or other testimony not previously designated "Highly Confidential" shall be treated as "Confidential" before such ten (10) day period has expired. In both of the foregoing instances, the designating party shall direct the court reporter that the appropriate confidentiality legend be affixed to the first page and all portions of the original and all copies of the transcript containing any Confidential or Highly Confidential Discovery Material. All portions of deposition transcripts not designated "Confidential" or "Highly Confidential" as provided in Subparagraph 6(b)(i) or (ii) herein shall be deemed not confidential. The parties may modify this procedure for any particular deposition, through agreement on the record at such deposition, without further order of the Court.

(c)     The inadvertent failure to designate Discovery Material as "Confidential" or "Highly Confidential" in accordance with Paragraphs 6(a) and (b) herein does not constitute a waiver of such claim and may be corrected by supplemental written notice at any time, with the effect that such Discovery Material will be subject to the protections of this Stipulation and Order from the time it is designated "Confidential" or "Highly Confidential." Upon receipt of such a supplemental designation, any receiving party that disclosed the Discovery Material prior to its designation as "Confidential" or





## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PAIGE CAPITAL MANAGEMENT, LLC,
PAIGE OPPORTUNITY PARTNERS, L.P.,
PAIGE OPPORTUNITY MASTER FUND,
LTD., and PAIGE GP, LLC,

    Plaintiffs,

    v.

LERNER MASTER FUND, LLC,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 5502-VCS

LERNER MASTER FUND, LLC,

    Counterclaim/Third-Party Plaintiff,

    v.

PAIGE CAPITAL MANAGEMENT, LLC,
PAIGE OPPORTUNITY PARTNERS, L.P.,
PAIGE OPPORTUNITY MASTER FUND,
LTD., PAIGE GP, LLC, MICHELE PAIGE,
CHRISTOPHER PAIGE and JESSICA PAIGE,

    Counterclaim/Third-Party Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

## STIPULATION AND ORDER GOVERNING THE PRODUCTION, EXCHANGE AND FILING OF CONFIDENTIAL MATERIAL

**IT IS HEREBY ORDERED,** pursuant to Rules 5(g) and 26(c) of this Court, and

good cause having been shown, that the following procedures shall govern the handling of

documents, depositions, deposition exhibits, interrogatory responses, admissions, and other

written, recorded, graphic, or electronic matter or information produced, filed with or

submitted to the Court and/or given or exchanged by and among any parties in the above-

captioned action ("Discovery Material"), including Discovery Material produced by non-parties to this action (the "Litigation").

1. All Discovery Material designated as "Confidential" or "Highly Confidential," or information derived therefrom, shall be used solely for purposes of this Litigation, including any appeal and retrial, and shall not be used for any other purpose, including, without limitation, any business or commercial purpose or any other litigation.

2. In submitting documents to the Court in connection with any submissions or filings, or in responding to a request for discovery in the Litigation, any party may designate as "Confidential" pursuant to this Stipulation and Order any material or testimony and information contained therein that it in good faith reasonably believes to contain non-public, confidential, proprietary or commercially sensitive information that requires the protections provided in this Stipulation and Order ("Confidential Discovery Material"), such that good cause exists for the filing and maintenance of such documents and information under seal.

3. For purposes of this Stipulation and Order, Discovery Material which may be designated as "Confidential Discovery Material" includes, but is not limited to, materials containing or constituting:

(a) non-public financial information and analyses, including information about employee compensation;

(b) tax data;

(c) business information;

(d) confidential portions, if any, of minutes of meetings;

(e) personal financial information; or

(f)     other personally or commercially sensitive or proprietary information.

Any party may also apply, pursuant to Court of Chancery Rule 5(g)(3), upon short notice and for good cause shown, for an order supplementing the foregoing categories of Confidential Discovery Material or to establish that particular Discovery Material is or is not Confidential Discovery Material.

4.      When Confidential Discovery Material contains trade secrets or business information that the producing party in good faith reasonably believes the disclosure of which would be likely to harm the competitive position of the producing party or would otherwise be injurious to the producing party, the producing party may designate such material as "Highly Confidential" ("Highly Confidential Discovery Material").

5.      For purposes of this Stipulation and Order, information which may be designated as "Highly Confidential Discovery Material" includes, but is not limited to, materials containing or constituting:

(a)     personnel information or assessments of company management or potential management;

(b)     internal documents or information related thereto, including reports, budgets, projections, analyses, proposals or presentations;

(c)     information relating to strategic transactions or other business combinations;

(d)     highly confidential portions, if any, of minutes of meetings;

(e)     financial or business plans and strategies;

(f)    customer or investor lists and customer or investor account information; or

(g)    other highly sensitive or proprietary information.

Any party may also apply, pursuant to Court of Chancery Rule 5(g)(3), upon short notice and for good cause shown, for an order supplementing the foregoing categories of Highly Confidential Discovery Material or to establish that particular Discovery Material is or is not Highly Confidential Discovery Material.

6.    The designation of Discovery Material as "Confidential" or "Highly Confidential" Discovery Material for purposes of this Stipulation and Order shall be made in the following manner by any party (or any non-party participating in the Litigation):

(a)    In the case of electronic or paper documents or other materials (apart from depositions or other pre-trial testimony), designation shall be made (i) by affixing the legend "Confidential" or "Highly Confidential" to each page containing any Confidential or Highly Confidential Discovery Material or (ii) by including the designation "-C-" or "-HC-" in the Bates prefix of the document or other material.

(b)    In the case of depositions or other pre-trial testimony, designation of the portion of the transcript (including exhibits) which contains Confidential or Highly Confidential Discovery Material shall be made (i) by a statement to such effect on the record during the proceeding in which the testimony is received, or (ii) by written notice served on counsel of record in this Litigation within ten (10)

Case 5:11-bk-05957-RNO   Doc 104   Filed 04/23/12   Entered 04/25/12 13:30:45   Desc
Main Document   Page 28 of 60

"Highly Confidential" shall exercise its best efforts (i) to ensure the return or destruction of such Discovery Material, (ii) to ensure that any paper or electronic documents derived from any such Discovery Material, which paper and electronic documents may be retained by the receiving party, is treated as if the Discovery Material had originally been designated "Confidential" or "Highly Confidential," (iii) to ensure such Discovery Material, and any information derived therefrom, is used only for the purposes described in Paragraph 1 of this Stipulation and Order, and (iv) to ensure such Discovery Material is not further disclosed except in accordance with the terms of this Stipulation and Order. If materials are redesignated "Confidential" or "Highly Confidential," any receiving party shall exercise best efforts to return to the producing party, or destroy all copies of, inappropriately designated materials (other than record file and work product documents, which thereafter shall be treated as if the subsequent designation had been made). The parties shall exercise best efforts to cooperate to protect later-designated materials that previously have been filed with the Court.

(d)     The receiving party shall exercise best efforts to ensure that copies it makes of Discovery Material produced to it, and copies made by others who obtained such Discovery Material directly or indirectly from the receiving party, include the appropriate confidentiality legend, to the same extent that the Discovery Material has been

Case 5:11-bk-05957-RNO     Doc 104    Filed 04/23/12    Entered 04/25/12 13:30:45    Desc
Main Document      Page 29 of 60

marked with the appropriate confidentiality legend by the producing party.

7. Discovery Material designated "Confidential" may be disclosed, summarized, described, characterized or otherwise communicated or made available in whole or in part, by a non-producing party, only to the following persons:

(a) outside- or, subject to Paragraph 9 hereof, inside-counsel who represent parties that have appeared in this Litigation, and regular or temporary employees and service vendors of such counsel (including outside copying and litigation support services) assisting in the conduct of the Litigation for use in accordance with this Stipulation and Order;

(b) subject to Paragraph 9 hereof, experts or consultants assisting counsel for parties that have appeared in the Litigation;

(c) witnesses or deponents (other than employees of the parties), and their counsel, during the course of and, to the extent necessary, in preparation for depositions or testimony in the Litigation, provided that each deponent shall first sign an undertaking in the form attached as Exhibit A hereto, agreeing in writing to be bound by the terms and conditions of this Stipulation and Order and agreeing not to disclose or use any Confidential or Highly Confidential Discovery Material in a manner or for purposes other than those permitted hereunder, including after the conclusion of this Litigation;

Case 5:11-bk-05957-RNO   Doc 104   Filed 04/23/12   Entered 04/25/12 13:30:45   Desc
Main Document   Page 30 of 60

throughout and after the conclusion of the Litigation, including without limitation any appeals therefrom, subject to the rules of any appellate court which may override this Stipulation and Order in any or all respects. Within forty-five (45) days after receiving notice of the entry of an order, judgment or decree finally disposing of all litigation in which Confidential or Highly Confidential Discovery Material is permitted to be used, including the exhaustion of all possible appeals and other review, each person having received Confidential or Highly Confidential Discovery Material shall, upon the request of the producing party, either return such material and all copies thereof to counsel for the party that produced such material or destroy all such Confidential or Highly Confidential Discovery Material and provide certification of such destruction to the producing party or non-party. Outside counsel for the parties shall be entitled to retain court papers, deposition transcripts, trial transcripts and attorney work product (which include within them references to Confidential or Highly Confidential Discovery Material) provided that such outside counsel, and employees of such outside counsel, shall not disclose such court papers or attorney work product to any person except pursuant to court order or agreement with the party that produced the Confidential or Highly Confidential Discovery Material. All Discovery Materials returned to the parties or their counsel by the Court and all Discovery Material in the possession of outside copying and litigation support services likewise shall be disposed of in accordance with this Paragraph.

19.     Any party who seeks the sealing of any filed document containing Confidential or Highly Confidential Discovery Material to continue beyond the three-year period established by Court of Chancery Rule 5(g)(8) may petition the Court for continued sealing pursuant to Court of Chancery Rule 5(g)(8).

Case 5:11-bk-05957-RNO    Doc 104    Filed 04/23/12    Entered 04/25/12 13:30:45    Desc
                    Main Document        Page 31 of 60

(d)    the Court and its employees pursuant to Paragraphs 11 and 12 of this Stipulation and Order;

(e)    court reporters employed in connection with the Litigation;

(f)    the parties in this Litigation; and the directors, officers and employees of the parties who are assisting counsel in this Litigation or who appear as witnesses or deponents, but only to the extent reasonably necessary for such directors, officers and employees of the parties to assist counsel in the prosecution or defense of this litigation;

(g)    any person indicated on the face of a document to be the author, addressee, or a copy recipient of the document, or any other person who otherwise is shown to have properly received previously a copy of the document the receipt of which is not in violation of this Stipulation and Order or any obligation of confidentiality; and

(h)    any other person only upon order of the Court or upon stipulation of the party that produced the Discovery Material designated "Confidential."

8.    Discovery Material designated "Highly Confidential" may be disclosed, summarized, described, characterized or otherwise communicated or made available in whole or in part, by a non-producing party, only to the following persons:

(a)    outside- or, subject to Paragraph 9 hereof, inside- counsel who represent parties that have appeared in this Litigation, and regular or temporary employees and service vendors of such counsel

(including outside copying and litigation support services) assisting in the conduct of the Litigation for use in accordance with this Stipulation and Order;

(b)     subject to Paragraph 9 hereof, experts or consultants assisting counsel for parties that have appeared in the Litigation;

(c)     any person indicated on the face of a document to be the author, addressee, or a copy recipient of a document, or any other person who otherwise is shown to have properly received previously a copy of a document, the receipt of which is not in violation of this Stipulation and Order or any obligation of confidentiality;

(d)     deposition or trial witnesses who authored, received, or are employed by the party that produced the Discovery Material designated "Highly Confidential;"

(e)     the Court and its employees pursuant to Paragraphs 11 and 12 of this Stipulation and Order;

(f)     court reporters employed in connection with the Litigation;

(g)     any other person only upon order of the Court or upon stipulation of the party that produced the Discovery Material designated "Highly Confidential."

9.     Confidential or Highly Confidential Discovery Material may be provided to persons listed in Paragraphs 7(b) and 8(b) above, and inside counsel pursuant to Paragraphs 7(a) or 8(a) above,  to the extent necessary for such expert, consultant, or inside counsel to prepare a written opinion, to prepare to testify, or to assist counsel in the prosecution of this

{A&B-0014666}

9

Litigation, provided that such expert, consultant, or inside counsel is using said Confidential or Highly Confidential Discovery Material solely in connection with this Litigation; and further provided that such expert, consultant, or inside counsel signs an undertaking in the form attached as Exhibit A hereto, agreeing in writing to be bound by the terms and conditions of this Stipulation and Order and agreeing not to disclose or use any Confidential or Highly Confidential Discovery Material in a manner or for purposes other than those permitted hereunder, including after the conclusion of this Litigation.

10. Counsel for the party showing or disclosing Confidential or Highly Confidential Discovery Material to any person required to execute an undertaking pursuant to Paragraph 9 shall be responsible for obtaining such signed undertaking and retaining the original, executed copy thereof, provided that non-party witnesses to whom Confidential Discovery Material is first disclosed at trial need not be required to sign a copy of Exhibit A in order to be bound by the terms hereof. When serving subpoenas on non-parties, a copy of this Stipulation and Order (including Exhibit A) shall be included with the subpoena.

11. All documents of any nature filed with the Court, including but not limited to letters and briefs, that disclose information from a document that would otherwise need to be filed under seal pursuant to this Stipulation and Order, shall be filed under seal in accordance with the provisions of Court of Chancery Rule 5(g).

12. Documents which contain information which has been designated "Confidential" or "Highly Confidential" shall be filed in accordance with Rules 5(g) and 79.1 and the Administrative Directive of the Chancellor of the Court of Chancery of the State of Delaware Amended No. 2003-1: eFile Administrative Procedures regarding the

filing of sealed documents. All such materials so filed shall be released from confidential treatment by the Register in Chancery only as provided by Chancery Court Rule 5(g)(7) or upon further order of the Court.

13.     During the pendency of the Litigation, in accordance with the provisions of Court of Chancery Rule 5(g), any party to the Litigation who objects to the designation of any Discovery Material or testimony as "Confidential" or "Highly Confidential" may, after making a good faith effort to resolve any such objection, file an application with the Court to challenge the designation of such Discovery Material as "Confidential" or "Highly Confidential." While such an application is pending, the Discovery Material or testimony in question shall continue to be treated as "Confidential" or "Highly Confidential."

14.     Entering into, agreeing to and/or producing or receiving Confidential or Highly Confidential Discovery Material or otherwise complying with the terms of this Stipulation and Order shall not:

(a)     operate as an admission by any party that any particular Confidential or Highly Confidential Discovery Material contains or reflects trade secrets or any other type of confidential information;

(b)     prejudice in any way the rights of the parties to object to the production of documents they consider not subject to discovery, or operate as an admission by any party that the restrictions and procedures set forth herein constitute adequate protection for any particular information deemed by any party to be Confidential or Highly Confidential Discovery Material;

Case 5:11-bk-05957-RNO    Doc 104    Filed 04/23/12    Entered 04/25/12 13:30:45    Desc
Main Document      Page 35 of 60

(c)     prejudice in any way the rights of any party to object to the production of any document requested on confidentiality, relevancy or any other grounds. Moreover, nothing herein shall constitute a waiver of the right to object to the authenticity or admissibility into evidence of any document subject to this Stipulation and Order;

(d)     prejudice in any way the rights of a party to obtain a determination by the Court, pursuant to Court of Chancery Rule 5(g)(6) or otherwise, whether any Discovery Material is, should, or should not continue to be subject to the terms of this Stipulation and Order;

(e)     prejudice in any way the rights of a party to petition the Court for a further protective order relating to any purportedly confidential information;

(f)     prevent the parties from agreeing to alter or waive the provisions or protections provided for herein with respect to any particular Discovery Material; or

(g)     relieve any party or other person of any obligation to comply with any confidentiality or other provision of any other agreement.

15.    This Stipulation and Order has no effect upon, and shall not apply to, the parties' use of their own Confidential or Highly Confidential Discovery Material for any purpose. Nothing herein shall impose any restrictions on the use or disclosure by a party of documents, materials or the information designated as "Confidential" or "Highly Confidential" obtained lawfully by such party independently of the discovery proceedings in this Litigation.

16.    If documents or other information subject to a claim of attorney-client privilege, attorney work product or any other ground upon which production of such information may be withheld from any party is nevertheless inadvertently produced, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of privilege, work product or any other ground for withholding production to which the producing party or other producing person would otherwise be entitled. If a claim of inadvertent production is made pursuant to this Paragraph with respect to documents or information then in the custody of another party, such party shall promptly return to the claiming party or person that material as to which the claim of inadvertent production has been made (including all copies thereof) and no use shall be made of such documents or other information for any purpose. The party(ies) returning such material may then move the Court for an order compelling production of this material, but the motion shall not assert as a ground for entering such an order the fact or circumstances of the inadvertent production or the substance (as opposed to the type or nature) of the material; nor shall such motion include or otherwise disclose, as an attachment or exhibit or otherwise, the material (or any portion thereof) which is the subject of such motion.

17.    In the event additional parties join or are joined in this action, the newly joined party(ies) shall not have access to Confidential or Highly Confidential Discovery Material until its counsel has executed and, at the request of any party, filed with the Court its agreement to be fully bound by this Stipulation and Order.

18.    The provisions of this Stipulation and Order shall, absent written permission of the producing party or further order of the Court, continue to be binding

20.     In the event that any Confidential or Highly Confidential Discovery Material is used in any court proceeding in this Litigation or any appeal therefrom, said Confidential or Highly Confidential Discovery Material shall retain its status as Confidential or Highly Confidential Discovery Material through such use except (a) to the extent ordered otherwise by the Court or (b) to the extent such Discovery Material becomes part of the public record in the Litigation. Counsel shall confer in good faith on such procedures that may be necessary or advisable to protect the confidentiality of any documents, information and transcripts used in the course of any court proceedings. If the parties cannot agree on an approach, the matter shall be presented to the Court for disposition.

21.     If any person receiving documents covered by this Stipulation and Order (the "Receiver") is subpoenaed in another action or proceeding or served with a document demand, and such subpoena or document demand seeks Discovery Material which was produced or designated as "Confidential" or "Highly Confidential" by someone other than the Receiver, the Receiver shall (i) give written notice by hand, overnight delivery, facsimile transmission or e-mail promptly, and in no event later than three (3) business days after receipt of such subpoena or document demand, to those who produced or designated the material "Confidential" or "Highly Confidential" and, except as ordered otherwise by a court of competent jurisdiction, (ii) refrain from producing any Discovery Material that has been designated "Confidential" or "Highly Confidential" in response to such a subpoena or document demand until the earlier of (x) receipt of written notice from the producing party that such party does not object to production of the designated Discovery Material or (y) resolution of any objection asserted by the

Case 5:11-bk-05957-RNO    Doc 104    Filed 04/23/12    Entered 04/25/12 13:30:45    Desc
Main Document      Page 38 of 60

producing party either by agreement or by order of the court with jurisdiction over the objection of the producing party. The burden of opposing the enforcement of the subpoena shall fall solely upon the party who produced or designated the Confidential or Highly Confidential Discovery Material. Notwithstanding the foregoing, unless the party who produced or designated the Confidential or Highly Confidential Discovery Material submits a timely objection seeking an order that the subpoena not be complied with, and serves such objection upon the Receiver by hand delivery prior to production pursuant to the subpoena, the Receiver shall be permitted to produce documents responsive to the subpoena on the subpoena response date. Compliance by the Receiver with any order directing production pursuant to the subpoena of any Confidential or Highly Confidential Discovery Material shall not constitute a violation of this Stipulation and Order. Nothing herein shall be construed as requiring the Receiver or anyone else covered by this Stipulation and Order to challenge or appeal any order directing production of Confidential or Highly Confidential Discovery Material covered by this Stipulation and Order, or to subject himself or itself to any penalties for non-compliance with any legal process or order, or to seek any relief from this Court.

22.     This Stipulation and Order applies to all Discovery Material produced in this Litigation, whether produced before or after the entry of this Stipulation and Order and whether produced by a party or non-party.

23.     This Stipulation and Order may be changed only by further agreement of all parties in writing or by order of the Court, and is without prejudice to the rights of any party to seek modification of this Stipulation and Order by application to the Court on notice to the other parties hereto.

Case 5:11-bk-05957-RNO    Doc 104    Filed 04/23/12    Entered 04/25/12 13:30:45    Desc
                          Main Document      Page 39 of 60

24.    Nothing in this Stipulation and Order shall preclude any party from seeking judicial relief, in good faith and upon notice to the other parties, with regard to any provision hereof.


OF COUNSEL:

Steven F. Molo
Nicole J. Coward
MOLOLAMKEN LLP
540 Madison Avenue
New York, New York 10022
(212) 607-8160

Robert K. Kry
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037

(202) 556-2000

*/s/ Eric D. Selden*
Kevin G. Abrams (Bar No. 2375)
Eric D. Selden (Bar No. 4911)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware 19807
(302) 778-1000

*Attorneys for Plaintiffs and Counterclaim
Defendants Paige Capital Management,
LLC, Paige Opportunity Partners, L.P.,
Paige Opportunity Master Fund, Ltd.,
and Paige GP, LLC*


OF COUNSEL

David Boies
Christopher E. Duffy
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
(212) 446-2300

*/s/ Joel Friedlander*
Joel Friedlander (Bar No. 3163)
BOUCHARD MARGULES &
  FRIEDLANDER, P.A.
222 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
(302) 573-3500

*Attorneys for Defendant and Counterclaim
and Third-Party Plaintiff Lerner Master
Fund, LLC*

Dated: September 1, 2010


SO ORDERED this _____ day of _____, 2010.


_____
Vice Chancellor

This document constitutes a ruling of the court and should be treated as such

|  |  |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Leo E Strine |
| **File & Serve Transaction ID:** | 32998776 |
| **Current Date:** | Sep 02, 2010 |
| **Case Number:** | 5502-VCS |
| **Case Name:** | Paige Capital Management LLC vs Lerner Master Fund LLC |
| **Court Authorizer:** | Leo E Strine |

/s/ **Judge Leo E Strine**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

- - -

| | | |
|---|---|---|
| IN RE: | : | Chapter 7 |
| CHRISTOPHER PAIGE and | : | |
| MICHELE PAIGE, | : | |
| Debtors. | : | Case No. |
| | : | 11-bk-05957-JJT |

- - -

January 6, 2012

341 HEARING

- - -

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com

Magna Legal Services

```
 1    APPEARANCES:

 2    OLEYAR LAW, P.C.
      MICHAEL G. OLEYAR, ESQUIRE
 3    1261 North Church Street
      Hazelton, Pennsylvania 18202
 4    (570)455-6800
      Representing the United States Trustee
 5

 6

 7

 8    SHEILS LAW ASSOCIATES, P.C.
      BY: JILL M. SPOTT, ESQUIRE
 9    108 North Abington Road
      Clarks Summit, Pennsylvania 18411
10    (570)587-2600
      Representing the Debtors
11

12

13

14    MORGAN, LEWIS & BOCKIUS, LLP
      BY: JOHN C. GOODCHILD, III, ESQUIRE
15    1701 Market Street
      Philadelphia, Pennsylvania 19103
16    (215)963-5485
      Representing Lerner Master Fund, LLC
17

18

19                      -   -   -

20

21

22

23

24
```

Case 5:11-bk-05957-RNO    Doc 104    Filed 04/23/12    Entered 04/25/12 13:30:45    Desc
Main Document    Page 43 of 60

Page 68

1    BY MR. GOODCHILD:

2         Q       I don't think they answered it,

3    but I will move on from it.

4         A       We budgeted as best we could.  We

5    did everything we did to control expenses.

6         Q       I understand your testimony.

7         A       Okay.  I didn't know.

8         Q       I understand that portion of it.

9              MR. OLEYAR:  The corporate records

10            minutes, whose possession are they in?

11            CHRISTOPHER PAIGE:  They all

12         destroyed.  LMF ordered us to destroy

13         them, they're gone.

14            MR. OLEYAR:  What did you destroy

15         specifically?

16            CHRISTOPHER PAIGE:  Everything.

17         LMF requested under the order from the

18         court to get rid of the highly

19         confidential and confidential.  They were

20         told that that wasn't possible that

21         everything had to be destroyed, so it's

22         all gone.

23            MR. OLEYAR:  The four business

24         entities; POP, PCM, PO --



**IN RE MARRIOTT HOTEL PROPERTIES II LIMITED PARTNERSHIP
UNITHOLDERS LITIGATION**

**CONSOLIDATED C.A. NO. 14961**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*1997 Del. Ch. LEXIS 128*

**September 4, 1997, Date Submitted
September 17, 1997, Date Decided**

**SUBSEQUENT HISTORY:** [*1] Released for Publication by the Court September 26, 1997.

**DISPOSITION:** Plaintiffs' motion for voluntary dismissal granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff limited partners sought to enjoin a tender offer by defendants, acquisition corporation and its corporate and individual affiliates, for outstanding limited partnership units. Following denial of a preliminary injunction and closure of the tender offer, the limited partners sought voluntary dismissal under Del. Ch. Ct. R. 41(a)(2), without prejudice and without imposition on them of the acquisition corporation's costs and fees.

**OVERVIEW:** The court rejected the acquisition corporation's argument that its substantial investment of time and effort would be wasted by granting the limited partners' motion. Other limited partners had filed a similar action against the acquisition corporation in Florida state court, which action was removed to federal court and set for trial, and much of the preparation for the Florida action was the same as for the Delaware action. Not all duplicated efforts were chargeable to the limited partners, and there was no evidence they improperly sought to delay the Delaware action. It was in the best interests of the parties to allow the limited partners to join the Florida action. The court ruled it was unfair to impose the acquisition corporation's costs and fees on the limited partners where there was no wasted or duplicative effort concerning the limited partners' motion to dismiss and much of the duplicated efforts in the Delaware and Florida actions resulted from motions filed by the acquisition corporation. The court did not reach the merits of the acquisition corporation's contemporaneous motion for dismissal pursuant to Del. Ch. Ct. R. 12(b)(6).

**OUTCOME:** The court granted the limited partners' motion for a voluntary dismissal without prejudice conditioned on their reasserting their claims only in the pending Florida action.

**LexisNexis(R) Headnotes**

*Civil Procedure > Dismissals > Voluntary Dismissals >
Court Orders > Conditions*
*Civil Procedure > Dismissals > Voluntary Dismissals >
Court Orders > Motions*
[HN1] An action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper. Del. Ch. Ct. R. 41(a)(2). Thus, a motion under Rule 41(a)(2) for a voluntary dismissal will not be granted as a matter of right; rather, it is directed to the sound discretion of the court. In exercising its discretion, the court is obliged to

act in such a way as to secure substantial justice to both parties.

*Civil Procedure > Dismissals > Voluntary Dismissals > General Overview*

[HN2] To defeat a Del. Ch. Ct. Rule 41(a)(2) motion, defendants are required to satisfy the burden of demonstrating plain legal prejudice. It is not a bar to a court-granted dismissal that the plaintiff may obtain some tactical advantage thereby.

*Civil Procedure > Dismissals > Voluntary Dismissals > Court Orders > Motions*

[HN3] Courts look to four factors in determining whether the defendant would suffer plain legal prejudice by the granting of a motion for a voluntary dismissal: (1) the defendants' effort and expense in preparation for trial; (2) excessive delay and lack of diligence on the part of plaintiff in prosecuting the action; (3) insufficient explanation for the need to take a dismissal; and (4) the fact that a motion for summary judgment has been filed by the defendant.

*Civil Procedure > Dismissals > Voluntary Dismissals > General Overview*
*Civil Procedure > Remedies > Costs & Attorney Fees > Costs > General Overview*

[HN4] The theory behind the allowance of expenses and counsel fees is to protect the defendants from being forced unnecessarily to incur two sets of attorney's fees.

*Civil Procedure > Dismissals > Voluntary Dismissals > General Overview*
*Civil Procedure > Remedies > Costs & Attorney Fees > Costs > General Overview*

[HN5] The prejudice envisioned by Del. Ch. Ct. R. 41(a)(2) is the cost of duplicative litigation in a second suit after dismissal of the first action; therefore, defendant is not entitled to any expenses incurred which are referable to activity which will be useful in any companion litigation as they would constitute a windfall.

*Civil Procedure > Dismissals > Voluntary Dismissals > General Overview*
*Civil Procedure > Remedies > Costs & Attorney Fees > Costs > General Overview*

[HN6] The decision as to whether or not to award

expenses and counsel fees is purely within the discretion of the court after a careful consideration of the equities involved.

**COUNSEL:** Norman M. Monhait, Esquire, of ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A., Wilmington, Delaware; OF COUNSEL: Lawrence P. Kolker, Esquire and Robert Abrams, Esquire, of WOLF, HALDENSTEIN, ADLER, FREEMAN & HERZ L.L.P., New York, New York; Lynda J. Grant, Esquire, of GOODKIND, LABATON, RUDOFF & SUCHAROW, L.L.P., New York, New York; Leigh Lasky, Esquire, of LASKY & RIFKIND, New York, New York; Attorneys for Plaintiff.

Lawrence C. Ashby, Esquire, Regina A. Iorii, Esquire and Richard I.G. Jones, Jr., Esquire, of ASHBY & GEDDES, Wilmington, Delaware; OF COUNSEL: Joseph M. Hassett, Esquire and John C. Keeney, Jr., Esquire, of HOGAN & HARTSON L.L.P., Washington, D.C.; Attorneys for Defendants.

**JUDGES:** Stephen P. Lamb, VICE CHANCELLOR.

**OPINION BY:** Stephen P. Lamb

**OPINION**

MEMORANDUM OPINION

LAMB, VICE CHANCELLOR

Pending before the Court are plaintiffs' motion for a voluntary dismissal pursuant to Rule 41(a)(2) and defendants' motion to dismiss plaintiffs' complaint pursuant to Rule 12(b)(6) for failure to state a claim for relief. Suit was brought in this Court and in the courts [*2] of the State of Florida by the limited partners against their general partner, the general partner's parent corporation, an affiliated corporation formed for the purpose of acquiring limited partnership interests and certain individuals who served as the directors and officers of the general partner. The Florida state court action was removed by defendants to the United States District Court for the Southern District of Florida (the "District Court"). The dispute relates to a tender offer made by the general partner's parent through its affiliate for a majority of the limited partnership interest. The plaintiffs here and in Florida purport to act both on behalf of a class of similarly situated persons and derivatively on behalf of the limited partnership. For the reasons

explained herein, I will grant plaintiffs' motion for a voluntary dismissal and do not reach the merits of the Rule 12(b)(6) motion.

## I. FACTS

The background facts necessary to decide this motion for a voluntary dismissal are provided below. The facts of the case are also discussed in this Court's earlier opinion denying plaintiffs' motion to preliminarily enjoin the tender offer. *See In re Marriott Hotel Properties* [*3] *Limited Partnership II Unitholders Litig., Del. Ch., C.A. No. 14961, 1996 Del. Ch. LEXIS 60*, Allen, C. (June 12, 1996).

### A. The Parties

The plaintiffs in this putative class action and derivative suit are the limited partners of Marriott Hotel Properties II Limited Partnership (the "Partnership"). The representative plaintiffs are three limited partnership interest holders: Cary W. Salter, Jr., Mackenzie Patterson Special Fund 2, L.P. and George Wasserman. Defendants are the general partner, Marriott MHP Two Corporation (the "General Partner" or "Marriott MHP"), its parent corporation, Host Marriott Corporation ("Host" or "Host Marriott"), MHP II Acquisition Corporation ("Acquisition Corp."), an entity wholly-owned by Host and formed for the purpose of carrying out the tender offer and four individuals, Bruce F. Stemerman, Robert E. Parsons, Jr., William E. Einstein and Christopher G. Townsend, who are sued in their capacities as the directors and principal executive officers of the General Partner.

### B. The Formation of the Partnership

The partnership was formed in 1988 to acquire, own and operate three hotels in the United States and to have a 50% interest in a fourth. A total of 745 [*4] limited partnership units were sold for a stated price of $ 100,000 each (or $ 89,247, if paid in cash at the time of subscription).

In important respects, the rights of the limited partners are restricted by the partnership agreement. First, while the limited partners have the right to assign their entire economic interest in the partnership without the General Partner's consent (subject only to certain limitations intended to preserve the entity's partnership tax status), the General Partner has the right to decide, in

its "absolute discretion," whether or not to admit an assignee of a limited partner's interest as a substituted limited partner. A limited partner's right to vote terminates upon the assignment of his interest, but only by becoming a substituted limited partner does the assignee of a limited partner's interest become entitled to vote. Second, the partnership agreement names Marriott MHP as the General Partner and states that it cannot be removed from this position by the limited partners unless it has breached a fiduciary duty. Third, the partnership agreement also provides that the general partner "shall have the exclusive right and power to conduct the business [*5] and affairs of the Partnership and to do all things necessary to carry on the business of the Partnership in accordance with the provisions of this Agreement and applicable law . . . ." Fourth, consonant with the broad managerial powers conferred on the General Partner, the voting rights of the limited partners are restricted to extraordinary transactions, such as a sale of the partnership's assets, a merger or a dissolution.

The restrictions on the ability of the limited partners to assign the right to vote and to replace the General Partner significantly curtail the ability of the limited partners, even acting together, to exercise control over the partnership or to transfer control thereof to any other person. This is not surprising in the context of this investment. The partnership was formed for the purpose of acquiring interests in four hotel properties managed by Marriott. Host obviously sought to prevent the transfer of control over the partnership, and thus, the underlying properties, to any other person.

Provisions of the partnership agreement recognize that, in dealing with Host or its affiliates, the General Partner would have a conflict of interest. Section 5.02.B(ii) [*6] of the partnership agreement contains specific provisions to deal with this conflict of interest in particular situations, for example, the sale of one or more hotels to Host Marriott. The partnership agreement does not contain any provision dealing directly with the circumstance of Host making a tender offer for the limited partnership interests.

The partnership agreement does affirm the existence of the general fiduciary duty owed by the General Partner to the limited partnership or the limited partners arising from 6 *Del. C. §* 17-403(b) and the common law. Section 5.03.I of the partnership agreement provides:

The General Partner shall be under a duty to conduct the affairs of the Partnership in good faith and in accordance with the terms of this Agreement and in a manner consistent with the purposes set forth in Section 2.03. Nothing contained in this Agreement is intended or shall be construed to contract away the fiduciary duty of the General Partner to the Limited Partners.

That the General Partner is, in general, in a fiduciary relationship with the limited partners is also acknowledged in the disclosure documents disseminated by Host in the tender offer: [*7] "Under Delaware Law, the General Partner has a fiduciary duty to the Partnership and is required to exercise good faith and loyalty in all its dealing with respect to Partnership affairs."

C. The Tender Offer

On April 18, 1996 Host, through Acquisition Corporation, commenced a tender offer to purchase any and all of the outstanding limited partnership units at a price of $ 125,000 per unit, provided that it obtained at least 50.1% of the outstanding units. The offer to purchase disclosed that the General Partner, due to its "substantial conflicts of interest with respect to the Offer" made "no recommendation to any Unitholder whether to tender or to refrain from tendering his or her Units." Rather, the limited partners were urged to make up their own minds about the merits of the tender offer. Similarly, the offer to purchase discloses that the offer price and the other terms and conditions of the tender offer were established by Host Marriott without arm's length negotiation between Host and the General Partner.

Host Marriott conditioned its tender offer on the approval by the limited partners of certain amendments to the partnership agreement necessary or desirable to [*8] facilitate the tender offer. Most significantly, Host sought changes in that Agreement to permit affiliates of the General Partner (including Host and Acquisition Corp.) to vote limited partnership interests acquired in the tender offer. It would appear that without this change, Host would not have consummated its tender offer. The General Partner disseminated consent solicitation materials to the limited partners which requested that the limited partners consider and vote upon the proposed

amendments. Evidently, in view of the General Partner's conflicted position, it merely submitted the proposed amendments to the limited partners for their consideration without any recommendation.

Host Marriott distributed to the limited partners an offer to purchase which explained the offer in detail. Among other things, the offer to purchase included the following: (1) the terms and conditions of the offer and explained that they were not the result of arm's length negotiations between Host Marriott and the partnership, but that American Appraisal Associates deemed them fair to the limited partners from a financial perspective; (2) the effect of successful completion of the tender offer on the [*9] voting rights of limited partners' choosing not to tender; and (3) the absence of any present intention on the part of Host to engage the partnership in an "extraordinary transaction, such as a merger, reorganization, liquidation, or sale . . . of assets."

While the tender offer was conditioned upon the successful completion of the consent solicitation, the tender offer and the consent solicitation were conducted separately; thus, a holder of limited partner interest was able to make a valid tender without consenting to the amendments to the partnership agreement and was able to consent to the amendments without tendering.

By the deadline for tendering imposed by the offer, only approximately 30% of the limited partnership units had been tendered. Consequently, Host raised the offering price to $ 150,000 and extended the offer for one month. This revised offer was successful in attracting enough units and consents to meet the conditions of the tender offer, and Host now owns and is entitled to vote a majority (50.6%) of the limited partnership interests in the partnership.

II. PROCEDURAL HISTORY

On April 24, 1996 Cary W. Salter, Jr. commenced this action on behalf of all limited [*10] partners of the partnership, seeking to enjoin the tender offer. At about the same time, MacKenzie Patterson Special Fund 2, L.P. ("MacKenzie") filed a similar suit in Maryland state court. Shortly thereafter, MacKenzie dismissed its complaint in Maryland and, with George Wasserman, filed suit in Delaware with this Court. On May 22, 1996 this Court consolidated the cases and designated the MacKenzie complaint as the consolidated complaint. On May 10, 1996, the Sylvia Bernice Rosenblum Trust filed

a third action in Florida state court, which was removed by the defendants to the United States District Court for the Southern District of Florida (the "Florida Action").

The complaints allege that the tender offer was made in breach of the defendants' fiduciary duties of care and loyalty and that the offer to purchase contains material omissions or misrepresentations in violation of the defendants' duty of disclosure. In general, the complaints allege that the price paid by Host was unfair. Plaintiffs' argument in support of this allegation is presented in two separate, but related, claims. First, the plaintiffs contend that the price should have included a control premium and, second that [*11] defendants had a fiduciary duty to ensure that the limited partners received a fair price, either as a matter of law or as a consequence of certain provisions of the partnership agreement.

On May 17, 1996 plaintiffs moved to enjoin preliminarily the tender offer. Argument was heard on June 10, 1996. Having withdrawn her motion for a preliminary injunction in the Florida Action, counsel for Florida plaintiff Rosenblum Trust appeared in this case and participated in the briefing on the motion for a preliminary injunction. This Court denied the motion in a memorandum opinion dated June 12, 1996. *See In re Marriott Hotel Properties II Limited Partnership Unitholders Litig., Del. Ch., C.A. No. 14961, 1996 Del. Ch. LEXIS 60*, Allen, C. (June 12, 1996).

In denying preliminary injunctive relief Chancellor Allen held, on a preliminary basis, that the structural elements of the partnership giving Marriott Host effective control over the management and disposition of the assets of the partnership precluded a finding that the limited partners were entitled to any premium for the passage of "control." In particular, he noted the provision of the partnership agreement giving the General Partner "absolute discretion" [*12] over the admission of persons as substituted limited partners and the legal consequence of that provision. *See In re Marriott* at 11 (stating express provisions of detailed limited partnership agreements concerning the rights and duties of the parties thereto, and not broad concepts of fiduciary duties, will "form the metric for determining breach of duty") (citing *In Re Cencom Cable Income Partners, L.P. Litig., Del. Ch., C.A. No. 14634, 1996 Del. Ch. LEXIS 17*, Steele, V.C. (Feb. 15, 1996)). Thus, he rejected plaintiffs' contention that defendants breached their fiduciary duties by failing to solicit possible alternative transactions,

finding instead that the "absolute discretion" enjoyed by the General Partner under the partnership agreement was entirely inconsistent with the existence of a fiduciary duty to locate or approve a sale at a higher price to a third party. *In re Marriott* at *21-23. This conclusion would seem to be consistent with and, indeed, compelled by applicable Delaware precedent. *See Mendel v. Carroll, Del. Ch., 651 A.2d 297 (1994)* (noting legal recognition of validity of "control premium" rooted in reality that markets value more highly blocks of securities that carry [*13] corporate control with them); *Paramount Communications, Inc. v. Time Inc., Del. Supr., 571 A.2d 1140 (1989)* (finding no duty to maximize present value of shares in transaction because no change of corporate control); *Paramount Communications Inc. v. QVC Network, Inc., Del. Supr., 637 A.2d 34, 48 (1993)* (finding directors' obligation to seek the best value reasonably available to the stockholders required only in case of change of control transaction).

The Chancellor also grounded his denial of the preliminary injunction motion on the well-established precedent that Host was under no fiduciary duty to offer a "fair" price for the limited partnership interests, so long as the tender offer did not entail coercion and was made with full disclosures. *See Lynch v. Vickers Energy Corp., Del. Ch., 351 A.2d 570, 576 (1976)*; rev'd *on other grounds, Del. Supr., 383 A.2d 278 (1977)*; *Solomon v. Pathe Communications Corp., Del. Supr., 672 A.2d 35, 39-40 (1996)* ("In the case of totally voluntary tender offers . . . courts do not impose any right of the shareholders to receive a particular price.") As Chancellor Marvel put it in *Lynch*, "it would not be appropriate under equitable [*14] principles . . . to bind an offeror [making a noncoercive tender offer on full information] to an implied commitment to pay an additional consideration for tendered shares in an amount made up of the difference between the price offered and what might ultimately be found to be the intrinsic value of the shares in question." *Lynch, 351 A.2d at 576*.

After reviewing the allegations of the complaint and the argument and record submitted in connection with the motion for preliminary injunction, the Chancellor also concluded, preliminarily, that the tender offer was not structurally coercive and that the plaintiffs had failed to persuade him "that there is a defect in the disclosures made." *In re Marriott* at *34. Thus, he denied the requested injunction.

After the tender offer closed, the defendants moved to dismiss both this action and the Florida Action. Evidently, the defendants also *moved* to stay the Florida Action in favor of this action, which motion was denied by the District Court on November 13, 1996. By order dated March 24, 1997, the District Court also denied the motion to dismiss.

Oral argument on the motion to dismiss this action was held on April 23, 1997. [*15] Due to his impending departure from office, Chancellor Allen discussed with counsel at argument the risk that he would find it impossible to decide the matter before the expiration of his term, a circumstance that eventuated. After the matter was reassigned, plaintiffs filed the motion for voluntary dismissal, pursuant to Rule 41(a)(2), and announced that, if their motion was granted, they would join in the prosecution of the Florida Action. Argument on that motion was scheduled to coincide with reargument of the motion to dismiss.

On August 14, 1997, the District Court in Florida entered a pretrial order setting the Florida Action down for trial on a four week calendar beginning October 5, 1998. The order also scheduled all pretrial proceedings to permit trial by that date. However, according to the Affidavit of John C. Keeney, Jr., Esquire ("Keeney Aff."), filed in opposition to the Rule 41(a)(2) motion, Judge Hurley, U.S.D.J., stated, during the teleconference in which he entered the pretrial order, that the October 1998 trial date would likely be changed due to the demands of his criminal docket. Keeney Aff. P 4.

III. ANALYSIS

A. Plain Legal Prejudice

In their motion, [*16] plaintiffs seek an order of voluntary dismissal without prejudice and without the imposition upon them of any of defendants' costs or fees associated with this matter. Rule 41(a)(2) states in pertinent part: [HN1] "an action shall not be dismissed at the plaintiff's instance save upon order of the Court and upon such terms and conditions as the Court deems proper. . . ." Ct. Ch. R. 41(a)(2). Thus, a motion under Rule 41(a)(2) for a voluntary dismissal will not be granted as a matter of right, rather, it is directed to the sound discretion of the Court. *See ASX Investment Corp. v. Newton, Del. Ch., C.A. No. 13452, 1994 Del. Ch. LEXIS 66, *6, Allen, C. (May 18, 1994)* (stating dismissal under Rule 41(a)(2) is within sound discretion

of court and not a matter of right). In exercising its discretion, the Court is obliged to act in such a way as to "secure substantial justice to both parties." *See Draper v. Gardner Defined Plan Trust, Del. Supr., 625 A.2d 859, 863 (1993); Lunn v. United Aircraft Corp., 26 F.R.D. 12, 13 (D. Del. 1960);* 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2364 at 274 (1996) (stating determination is within sound discretion of court and [*17] its order is reviewable only for abuse of discretion).

[HN2] To defeat the Rule 41(a)(2) motion, defendants are required to satisfy the burden of demonstrating "plain legal prejudice." *Draper, 625 A.2d at 863. See also ASX Investment Corp. at 5* (stating motion generally granted unless doing so would cause defendant to suffer "plain legal prejudice"). It is not a bar to a court-granted dismissal that the plaintiff may obtain some tactical advantage thereby. Wright & Miller, *supra,* § 2364 at 282-83.

Defendants oppose the motion and urge the Court to retain jurisdiction over this case and press it to an early conclusion. They take this position notwithstanding the fact that all of their efforts to stay the Florida Action in favor of this action or to secure the early dismissal of that action have failed. Thus, if the plaintiffs' motion is denied, there will be two actions pending in two courts arising out of the same set of facts and asserting essentially the same theories of recovery. Presumably, defendants will press to have this case tried first, while the class representatives may prefer to resolve the Florida Action in advance of this one. In either case, there is almost [*18] certain to be duplication and waste of judicial resources. [1]

1 Defendants invite a decision on their pending motion to dismiss, even if the Court is inclined to grant the motion under Rule 41(a)(2), presumably because they believe such a decision would be of assistance to them in defending against the Florida Action. I conclude that I should not accept this invitation because the posture of this action does not permit a definitive resolution of the issues presented. Because the District Court has already denied defendants' motion to dismiss the Florida Action, only a decision on a full record can be helpful in bringing the Florida Action to a conclusion. The present posture of this case does not permit such an ultimate determination.

[HN3]

Courts look to four factors in determining whether the defendant would suffer "plain legal prejudice" by the granting of a motion for a voluntary dismissal:

> (1) the defendants' effort and expense in preparation for trial;

> (2) excessive delay and lack of diligence [*19] on the part of plaintiff in prosecuting the action;

> (3) insufficient explanation for the need to take a dismissal; and

> (4) the fact that a motion for summary judgment has been filed by the defendant.

*Draper, 625 A.2d at 864.* Factors (2), (3) and (4) are not implicated in this matter; there is no claim that plaintiffs have not prosecuted this case diligently and without undue delay, the reasons plaintiffs seek leave to join the Florida Action are plain, and no motion for summary judgment has been filed. [2]

> 2   With regard to the filing of a motion for summary judgment, the Supreme Court stated that it had the effect of moving the case from a Rule 41(a)(1) to a Rule 41(a)(2). However, the Court continued, stating that the effect of the motion:

>> is of no other consequence in evaluating the scale of 'legal prejudice' in this action, except in evaluating whether or not the substance of the motion raises or presents issues which may be relevant to the question of whether or not defendants will suffer plain legal prejudice in the event of a dismissal.

> *Draper, 625 A.2d at 864.*

[*20] In order to justify the denial of a voluntary dismissal without prejudice, therefore, defendants must show that they have invested a substantial amount of time and effort which will be wasted by a dismissal, and the case must have been developed to a significant extent.

*ASX Investment Corp.* at 5. While there has been a substantial amount of time and resources devoted to this action, there has been no discovery undertaken and little or no resources devoted to the preparation of the case for trial. Instead, the activity here has been confined to litigating, without discovery, the preliminary injunction motion and briefing and arguing the pending Rule 12(b)(6) motion. The preliminary injunction proceedings were necessary to undertake and not wasted. The briefing on the defendants' motion to dismiss was, to a large extent, the same here as in Florida. While some time and resources were, in a sense, "wasted" as a result of the simultaneous briefing of those motions here and in the District Court, it was not so substantial in time or effort to amount to plain legal prejudice. Moreover, it is not clear to me why that duplicated effort is at all chargeable to plaintiffs, who filed only [*21] this case and never opposed defendants' efforts to force the Florida plaintiff to litigate in this Court. *See* discussion, *infra*, at page *21-22.

Rather than argue that this case is developed to a significant extent, defendants argue that the Florida Action is not further advanced than this one. In actuality, while both actions are in the preliminary stages of litigation and await commencement of substantial discovery, the Florida Action has advanced beyond the motion to dismiss stage and a pretrial order has been entered setting the matter for trial in October of next year. Whether or not that trial date holds, it is evident that the District Court intends to move the Florida Action expeditiously to a state of trial readiness. In contrast, the Delaware action has not advanced beyond the stage of litigating about the sufficiency of the pleadings under this Court's arguably more onerous standards.

Further, there is no evidence that plaintiffs have improperly sought to delay the action in this Court in order to gain a more favorable result in the Florida Action, nor did they undertake to frustrate defendants' attempts diligently to defend against this suit. In this regard, [*22] it is important to note that there is no evidence to suggest that the Delaware actions were not filed independently of the Florida Action nor as part of a plan to prevent other persons from utilizing this forum. Plaintiffs did not agree to coordinate their activities with the Florida plaintiffs until it became apparent that the two actions were proceeding on parallel tracks. [3] Further, plaintiffs did not move for a voluntary dismissal of this action until the District Court had already denied the

motion to dismiss the Florida Action.

3   At oral argument defendants cited the *In Re The Walt Disney Company Derivative Litigation* opinion written by Vice Chancellor Chandler in which he denied plaintiffs' motion for a *voluntary* dismissal pursuant to Chancery Court Rule 41(a)(2). In that case plaintiffs' counsel filed almost identical complaints in this Court and in the Superior Court of the State of California. Vice Chancellor Chandler denied plaintiffs' motion because, as he stated:

> I do not believe equity or fairness is served by allowing plaintiffs' counsel to repudiate the jurisdiction in which they have deliberately chosen to litigate, a jurisdiction they selected while fully aware of the convenience and efficiency concerns that they now invoke as grounds for suspending operations on the Delaware front and moving to an alternative battle ground.

*In Re The Walt Disney Company Derivative Litig.*, C.A. No. 15452, 1997 Del. Ch. LEXIS 25, *9-10, Chandler, V.C. (March 13, 1997). The circumstances in that case and the present one are distinguishable, however, by the fact that in this case the two suits were filed by different parties. Plaintiffs in this case did not file multiple suits for the sole purpose of attempting to gain a tactical advantage. It is only now, over one year after filing of the suit, that plaintiffs seek to dismiss this action in favor of joining their suit with the one independently filed in Florida.

[*23] Ultimately, it is in the best interests of all the parties to have this case heard and decided by one court where all the parties and issues can be joined in a single action. *See In Re The Walt Disney Company Derivative Litig.*, Del. Ch., C.A. No. 15452, 1997 Del. Ch. LEXIS 25, *7, Chandler, V.C. (March 13, 1997) (Mem. Op.) (stating "courts have an important interest in managing the litigation process so as to promote judicial efficiency, comity, and the fair administration of justice."). For all these reasons, I will allow plaintiffs voluntarily to dismiss this action without prejudice so that they may take

whatever procedural steps are necessary for them to join the Florida Action.

   B. Terms and Conditions

   Defendants assert that they have incurred expenses as a result of being forced to defend this suit in Delaware. As a result, they argue they would suffer plain prejudice if they are not granted fees, costs and expenses as a prerequisite to the dismissal of this suit. Many of the same factors which support the grant of plaintiffs' motion also weigh against the imposition of fees, costs or expenses as a condition thereto.

   [HN4] The theory behind the allowance of expenses and counsel fees is to protect [*24] the defendants from being forced unnecessarily to incur two sets of attorney's fees. *See Oil and Gas Ventures, Inc. v. Cheyenne Oil Corp., Del. Ch., 43 Del. Ch. 182, 222 A.2d 312, 313 (1966)* (stating purpose is to protect defendant in situation where plaintiff seeks to dismiss without prejudice in one jurisdiction with the intention of pursuing companion litigation in another jurisdiction); *GAF Corp. v. Transamerica Insurance Co., 214 U.S. App. D.C. 208, 665 F.2d 364 (D.C. Cir. 1981)* (stating purpose of terms and conditions clause is to protect from any undue prejudice or inconvenience resulting from premature voluntary dismissal). [HN5] The prejudice envisioned by the rule is the cost of duplicative litigation in a second suit after dismissal of the first action, therefore, defendant is not entitled to any expenses incurred which are referable to activity which will be useful in any companion litigation as they would constitute a "windfall." *See GAF, 665 F.2d at 369* (stating defendant only entitled to those costs incurred in present action that are rendered useless by the dismissal of the action); *ASX Investment Corp.* at 8 (stating that any expenditures which will prove [*25] helpful in anticipated future litigation should not be charged to plaintiff). [HN6] The decision as to whether or not to award such monies is purely within the discretion of the Court after a careful consideration of the equities involved. *ASX Investment Corp.* at 8.

   No doubt, defendants have expended time and resources in the defense of this matter, first, in connection with the motion for a preliminary injunction, and, thereafter, on the motion to dismiss. It is less clear how defendants have been prejudiced thereby and how, whatever prejudice there may be, is attributable to the conduct of the plaintiffs. Motions for preliminary

injunction were made both in this case and in the Florida Action; however, only the one in this case was litigated, as the plaintiff in the Florida Action withdrew its separate motion and participated in the litigation of the motion before this Court. Thus, there was no wasted or duplicative effort in that connection.

After the motion for preliminary injunction was denied, defendants moved to stay or dismiss the Florida Action and to dismiss this action. When the motion to stay was denied by the District Court defendants simultaneously proceeded to litigate [*26] motions to dismiss the Florida Action and this action. Even after the District Court denied the motion to dismiss the Florida Action, defendants persevered in their efforts to dismiss this action, notwithstanding the fact that a dismissal here would likely be with prejudice only to the named plaintiffs, and (because the District Court had already upheld the sufficiency of the complaint in the Florida Action) would be unlikely to lead to the early dismissal

of the Florida Action. In these circumstances, it would not be fair or equitable to impose the costs, fees or expenses associated with that effort upon the plaintiffs.

For these reasons, and because I believe judicial economy is best served by granting plaintiffs' motion, I refuse to impose on plaintiffs any of the costs incurred by defendants in connection with this action. However, I do conclude that it would be unfair to permit the plaintiffs to prosecute their claims anywhere other than in the Florida Action. Thus, I will condition the "without prejudice" effect of the order granting the Rule 41(a)(2) motion so as to permit plaintiffs to reassert their claims only in that forum.

For all the reasons stated, I grant plaintiffs' [*27] motion voluntarily to dismiss this case without prejudice and without costs, fees or expenses. The parties shall attempt to reach agreement upon a form of order and submit it to the Court.



ASX INVESTMENT CORP., Plaintiff, v. R. PARK NEWTON, III, ARIS NEWTON, CHARLES ROSS, KERRY MARLER, JOHN CASKEY and ASSIX INTERNATIONAL, INC., a Delaware corporation, Defendants.

Civil Action No. 13452

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*1994 Del. Ch. LEXIS 66*

May 9, 1994, Submitted
May 18, 1994, Decided

**NOTICE:**

THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**DISPOSITION:** [*1] For the foregoing reasons, plaintiff's motion for a dismissal without prejudice will be granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff shareholder filed a motion with the Court of Chancery (Delaware) seeking dismissal of its action without prejudice pending related federal court action. Defendant directors opposed and moved for costs, claiming that dismissal without prejudice under Del. Ch. Ct. R. 41(a)(2) would expose them to relitigation of the same issues.

**OVERVIEW:** Plaintiff shareholder filed action in state court alleging that certain actions by defendant directors were designed to entrench defendants on the board. During discovery, plaintiff filed a federal action alleging insider trading, after becoming aware of violations § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C.S. § 78(b) and Rule 10(b)(5) that implements it. Plaintiff also filed a motion to dismiss its state action without prejudice. Defendants moved for denial of the motion, and for their costs, alleging that they would incur increased legal fees due to the additional pending case. The court held that because plaintiff's case had just entered the discovery phase, and defendants could use the information already gained in the state action to defend the federal action, defendant would not likely incur increased legal fees, and granted plaintiff's motion for dismissal without prejudice.

**OUTCOME:** The court granted plaintiff shareholder's motion for a dismissal without prejudice. The court held that because federal litigation was pending, and plaintiff's case was in its infancy, defendant directors had not incurred significant expenses, and therefore they were not entitled to costs.

**LexisNexis(R) Headnotes**

*Civil Procedure > Dismissals > Voluntary Dismissals > Court Orders > Conditions*
*Governments > Courts > Rule Application & Interpretation*
[HN1] Del. Ch. Ct. R. 41(a)(2) regulates the voluntary dismissal of suits after the defendant has filed an answer. It reads: Except as provided in paragraph (1) of this subdivision of this Rule, an action shall not be dismissed at the plaintiffs instance save upon order of the Court and

upon such terms and conditions as the Court deems proper.

**COUNSEL:** Alan J. Stone, Esquire and Michael L. Vild, Esquire, of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware. Attorneys for Plaintiff.

Charles F. Richards, Jr., Esquire, and Anne C. Foster, Esquire, of RICHARDS, LAYTON & FINGER, Wilmington, Delaware. Attorneys for Defendants.

**JUDGES:** ALLEN

**OPINION BY:** ALLEN

**OPINION**

*MEMORANDUM OPINION*

ALLEN, Chancellor

Pending is a motion for voluntary dismissal without prejudice, pursuant to Chancery Court Rule 41(a)(2). The motion is contested by defendants, Assix International Inc. and several Assix directors, who are also defendants. Defendants request that the court dismiss the action *with* prejudice, or impose as a condition to a dismissal without prejudice plaintiff's reimbursement of defendants' costs, including their legal expenses. The thrust of defendants' argument, in that connection, is that they will be harmed by a dismissal without prejudice, because they will be forced to relitigate the same issues raised here in an action recently filed by the plaintiff-shareholder in United States District Court for the Eastern District of Pennsylvania. Thus, they assert [*2] that the claims raised in this court should be barred from being relitigated, or, alternatively, that plaintiff should bear the cost of the duplicative litigation.

\* \* \*

The complaint was filed on April 8, 1994 by ASX Investments Corp., a shareholder of Assix, the defendant corporation. It sought, primarily, a preliminary injunction precluding Assix's board of directors from implementing a private placement of stock that would allegedly have entrenched the existing board. A hearing on plaintiff's motion for preliminary injunction was set down for May 17, 1994. Under an expedited discovery schedule,

plaintiff deposed several directors of Assix. Defendants also produced answers to interrogatories and produced requested documents. On April 22, 1994, before defendants were able to commence any of their scheduled depositions, but after defendants had filed their answer, plaintiff filed a motion for voluntary dismissal.

The court, after hearing argument on April 22, declined to rule on the dismissal motion. Instead, the court allowed defendants to proceed with certain limited discovery designed to determine whether there was a basis for seeking Rule 11 sanctions against plaintiff. Thus, [*3] the discovery allowed was restricted to facts bearing upon the basis for filing the complaint. Plaintiff, on April 25, provided defendants with interrogatory answers which disclosed the source of their information relating to the stock issuance (principally, one of the Assix directors). Plaintiff resisted, however, answering interrogatories seeking evidence relating to the manner and timing in which the director conveyed this information. Defendants then filed a motion under Rule 37 to compel plaintiffs to provide the requested information.

On April 25, at the same time as plaintiff was providing defendants with discovery directed towards their potential Rule 11 motion, plaintiff filed the federal action against *inter alia* Assix, and R. Park Newton (Assix's C.E.O.). [1] The thrust of this complaint was substantially different than the action filed in this court. The federal action alleged insider trading and fraudulent non-disclosure by R. Park Newton and two friends, in violation of Section 10(b), of the Securities and Exchange Act of 1934, 15 U.S.C. § 78(b) and Rule 10(b)(5) that implements it. The allegation was that Park Newton conveyed to [*4] these two individuals nonpublic information relating to Assix's imminent announcement of a lucrative settlement of a dispute that it has had with Sears. These individuals then allegedly purchased a substantial (greater than 5%) block of Assix stock, based upon this information. They did not, at this time, file a Schedule 13D with the S.E.C. disclosing their purchases. This not only provided a windfall to these defendants, but, plaintiffs alleged, cemented Park Newton's control of the company. Plaintiff contends that it was harmed when it subsequently obtained a substantial block of Assix stock without knowledge of these purchases. Thus, it sought damages for its injuries, and rescission of the purchases. [2]

1    Plaintiff says it discovered the facts underlying the Federal claims during the period in which it was taking depositions for the present action. Its decision to seek a dismissal of the Chancery action was, apparently, based on its conclusion that it would be more efficient to litigate the federal and state claims in the same action. Since the federal courts have exclusive jurisdiction over claims brought under the Securities and Exchange Act of 1934, this could only be accomplished by dismissing the Court of Chancery action and suing in federal court.

[*5]

2    Plaintiff also made claims in the federal complaint which are related to those raised in the Chancery action. For example, plaintiff sought a declaratory judgment to the effect that the rights plan the company had issued on April 18 was invalid. Plaintiff also sought a permanent injunction precluding defendants from taking any act "that is designed to or has the effect of (i) entrenching management and the current Board of Directors or (ii) disenfranchising the plaintiff and other public shareholders." *Pennsylvania Complaint* at 27.

On May 3, the court issued a decision on the motion to compel discovery. The motion was denied, on the theory that allowing additional discovery was contrary to Rule 1's mandate to secure the efficient resolution of disputes, and in all events, was premature in light of the fact that no motion for sanctions had yet been brought. *See ASX Investment Corp. v. R. Park Newton, III,* Del. Ch., C.A. No. 13452, Allen, C. (May 3, 1994). This left outstanding the following issues: whether granting plaintiff's motion will significantly harm defendants, and whether the [*6] case should, therefore, only be dismissed *with* prejudice; and the conditions, if any, which should be imposed upon an order of dismissal. I turn now to these remaining issues.

I.

(A) Plaintiff's motion for dismissal without prejudice should be granted.

Chancery Court Rule 41, entitled "Dismissal of Actions" governs this motion. In particular, [HN1] Rule 41(a)(2) regulates the voluntary dismissal of suits *after* the defendant has filed an answer. It reads:

Except as provided in paragraph (1) of this subdivision of this Rule, an action shall not be dismissed at the plaintiffs instance save upon order of the Court and upon such terms and conditions as the Court deems proper.

Thus, a voluntary dismissal under this rule is not a matter of right, but is within the sound discretion of the trial court. Generally, such motions are granted unless doing so would cause defendants to suffer "plain legal prejudice." *See Draper v. Gardner Defined Plan Trust, Del. Supr., 625 A.2d 859 (1993).* Relevant factors in evaluating prejudice to defendants include: "(1) the defendants' effort and expense in preparation for trial; (2) excessive delay and lack of diligence [*7] on the part of the plaintiff in prosecuting the action; (3) insufficient explanation for the need to take a dismissal; and (4) the fact that a motion for summary judgment has been filed by the defendant." *Id. at 864.* Thus, the mere prospect of a second lawsuit, without more, does not constitute "plain legal prejudice." *See* 9 Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure,* § 2364 at 165. Defendants must have invested a substantial amount of time and effort, and the case must have been developed to a significant extent, to justify a denial of a voluntary dismissal without prejudice. [3]

3    In cases where courts have denied a motion for dismissal without prejudice, defendants have invariably expended substantial resources in preparing for trial. *Ratkovich v. Smith Kline,* 8951 F.2d 155 (7th Cir. 1991) is a leading case on this issue. In that action, plaintiff alleged that his daughter sustained severe brain damage because her mother used a drug made by defendant during her pregnancy. During nearly two years of discovery, the defendants did extensive research into the mother's medical records. During this period, plaintiff repeatedly failed to answer defendant's interrogatories, and failed to obtain any documentation that the mother had ever taken the drug. The plaintiff then moved for voluntary dismissal. The Circuit Court upheld the decision to dismiss the case with prejudice. *See also Zagano v. Fordham University, 900 F.2d 12 (2nd Cir. 1990) cert. denied, 498 U.S. 899, 112 L. Ed. 2d 213, 111 S. Ct. 255 (1990)* (dismissal without prejudice denied when case had been pending for four years, extensive discovery had been taken,

and a trial date had been set).

[*8] The factors set forth above suggest that a dismissal without prejudice is appropriate here. The case was only a few weeks old when the motion was filed. Defendants have yet to conduct any substantial discovery. Their only significant expenses to date were incurred defending plaintiff's deposition of the Assix directors, and answering plaintiff's limited document requests and interrogatories. Furthermore, defendants have not expended resources in preparing and filing a summary judgment motion in this action. Thus, defendants will suffer little, if any, harm if the matter is dismissed, and they are unable to get a judgment on the issues raised. Nor does it appear that plaintiff behaved in a negligent or injudicious manner in its prosecution of the suit. Plaintiff did resist defendants' discovery requests, but only after it had decided to seek dismissal of the suit. Plaintiff now seeks, in effect, an order allowing them to resolve all of its claims against defendants in a single forum, rather than incurring the expense of two separate proceedings. Where there is little prejudice to defendants in dismissing the action, and a legitimate and apparent efficiency in doing so, a dismissal [*9] without prejudice is appropriate.

(B) The action should be dismissed without any conditions.

Defendants contend that if the court allows the case to be dismissed without prejudice, they should not be forced to bear the duplicative expense of relitigating these same claims in the Pennsylvania action. They therefore request that the court condition the dismissal of the action upon plaintiff's payment of their costs, including attorney's fees.

Rule 41(a)(2) allows the court to impose such "terms and conditions" upon a dismissal as it deems proper. The requirement that plaintiff pay defendant's attorney's fees is a commonly applied condition. Courts have evaluated the imposition of such a condition under standards different from those applicable to a motion for an award of attorney's fees under Rule 11. As a general matter, both requests are within the sound discretion of the court. In a Rule 11 context, to prevail a defendant must show that the plaintiff had no good grounds for bringing the suit. While such a conclusion would support an award of attorney's fees, under Rule 41(a)(2) something less may serve. When applied to a dismissal *without prejudice*, such an award may be based [*10] upon the conclusion

that the defendant will, ultimately, be forced to defend the same or related claims in another proceeding, and it is not equitable that he should bear the cost of the inevitable duplicative work which will arise. [4] *See Oil & Gas Ventures, Inc. v. Cheyenne Oil Corp., Del. Ch., 43 Del. Ch. 182, 222 A.2d 312, 313 (1966); Lunn v. United Aircraft Corp, 26 F.R.D. 12 (D. Del. 1960); GAF Corp v. Transamerica Insurance Co., 214 U.S. App. D.C. 208, 665 F.2d 364 (D.C. Cir. 1981).* [5] Putting it another way, such a condition forces the plaintiff to internalize the cost of duplicative litigation.

[4] That the condition of payments of defendant's cost is imposed with an eye to dupuctive litigation is revealed by the fact that courts have not generally imposed, as a condition to a dismissal *with* prejudice, a requirement that a plaintiff pay the defendant's costs. *See* 9 Wright & Miller, *Federal Practice and Procedure*, § 2366 at 180. Since there is no issue, in this circumstance, of a relitigation of the same claims, there is no basis to impose such a condition. As one court reasoned, "Fees are not awarded when a plaintiff obtains a dismissal *with prejudice* because the 'defendant cannot be made to defend again.'" *Cauley v. Wilson*, 754 F.2d 769 (8th Cir. 1985) quoting *Smoot v. Fox*, 353 F.2d 830, 833 (6th Cir. 1965) *cert. denied*, 384 U.S. 909 (1966).

[*11]

[5] While this is the majority rule, it is not unanimous. At least one Circuit Court has applied a Rule 11 "good faith" test in determining whether to condition a voluntary dismissal upon a payment of attorney's fees. *See Davis v. USX Corp.*, 819 F.2d 1270, 1276 (4th Cir. 1987).

The decision of whether or not to impose such a condition, therefore, should be based upon a careful consideration of the equities involved. *Oil and Gas Ventures Inc. v. Cheyenne Oil Corp., supra.* As a general matter, since the prejudice addressed by this rule is the cost of duplicative litigation, any expenditures by the defendant which is referable to activity which will be useful in the anticipated future litigation should not be imposed upon the plaintiff. Holding otherwise would give the defendant a windfall. *See, e.g., GAF Corp. v. TransAmerica Insurance, supra,* at 369-370 (defendant entitled to only those costs which derive from activities which would be useless in the subsequent litigation); *Mclaughlin v. Cheshire*, 219 U.S. App. D.C. 257, 676

*F.2d 855 (D.C. Cir. 1982).* [*12] [6] Furthermore, since the purpose of imposing such conditions is, presumably, to force plaintiffs to internalize the costs of poorly planned litigation, the court should consider whether plaintiff was in some way negligent or otherwise blameworthy in its decision to file the original action. If plaintiff could not reasonably have been aware of the conditions which gave rise to the dismissal motion and it inefficiency, and did not file the action for some improper purpose, then it would not, in my opinion, be equitable to penalize it. *See, e.g., Blackburn v. City of Columbus, 60 F.R.D. 197 (S.D. Ohio 1973)* (in absence of evidence that suit was brought to harass defendant or unnecessarily increase its costs, American rule that each side pays its own costs will apply); *Kolman v. Kolman, 58 F.R.D. 632 (W.D. Pa. 1973)* (fee condition imposed *because* plaintiff could have avoided need for dismissal by waiting for new Federal Rules of Evidence to take effect). *See also Oil & Gas Ventures, Inc. v. Cheyenne Oil Corp., Del. Ch., 43 Del. Ch. 182, 222 A.2d 312, 313 (1966)* (imposition [*13] of attorney's fees payment as condition to dimissal involves considerations of equity); *but see GAF Corp. at 369.* [7]

> 6    Indeed, some courts have not required a plaintiff to pay defendants' costs, unless and until the plaintiff files a second action. *See, e.g., Kern v. TXO Production Corp., 738 F.2d 968 (8th Cir. 1984).*
>
> 7    The court in that case seemed to apply a "strict liability" theory to the attorney's fee issue. It reasoned: "No matter how conscientious and diligent GAF may have been, Transamerica suffered some costs by defending this action in the District of Columbia before it was moved elsewhere, and Transamerica is entitled to such reimbursement of those costs as the court may order." *Id. at 369.* In that case, however, defendant bore some significant responsibility for the dismissal. It failed to join a party who, it later developed was both (1) indispensible and (2) would defeat the court's diversity jurisdiction. The reason defendant failed to join the party was because of an apparently erroneous theory of insurer liability. It is more reasonable, in my opinion, to penalize a party for an unnecessary filing stemming from mistake-of-law, than it would be to penalize him for a filing which was dismissed only in light of facts developed

pursuant to discovery.

[*14] Aside from the dispute concerning the terms of a Rule 41 dismissal, the costs defendants have apparently incurred in the present action are related to any legal research conducted by counsel in preparation for the resolution of the preliminary injunction motion, and to defending depositions and answering plaintiff's interrogatories. As to the costs incurred in defending these depositions, the evidence gathered will plainly be applicable in defending the entrenchment claims in the federal action. Thus, defendants would enjoy a windfall if plaintiff was compelled to pay its costs, including attorney's fees. [8] As to costs stemming from defendants' counsel's appearances, and any research counsel conducted in preparation for the injunction, these expenditures will have no apparent use in the federal action. Despite this fact, I do not believe defendants are entitled to plaintiff's payment of their costs. The facts underlying the federal claim, which could *not* be brought in this court, did not apparently become known to plaintiff until it conducted its discovery in this action. Thus plaintiff could not reasonably have foreseen that the federal court would be a more efficient forum [*15] for resolving the entire dispute. Furthermore, the urgency of the action brought here (plaintiff feared an imminent stock issuance which would have allegedly effectuated a transfer of corporate control) precluded plaintiff from developing these facts prior to filing this action. This being the case, I see no reason to impose a penalty upon plaintiff for attempting to resolve the dispute originally in the Court of Chancery and in then seeking to resolve all related claims in the United States District Court, where all could be resolved more efficiently in a single proceeding.

> 8    Defendants have apparently retained different counsel in the Philadelphia action. Defendants' counsel in this action assert that the discovery gathered herein will not be applicable in the federal action. I see no reason why the parties cannot agree that evidence gathered in this action be admitted as evidence in the federal action. Thus, I do not accept defendants' Delaware counsel's assertion that the discovery already conducted will be of no use in the federal action.

[*16] For the foregoing reasons, plaintiff's motion for a dismissal without prejudice will be granted.



Richard Schoon, et al. v. Troy Corp.

C. A. No. 1677-N

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*2006 Del. Ch. LEXIS 136*

July 12, 2006, Submitted
July 24, 2006, Decided

NOTICE:

[*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

PRIOR HISTORY: *Schoon v. Troy Corp., 2006 Del. Ch. LEXIS 123 (Del. Ch., June 27, 2006)*

CASE SUMMARY:

PROCEDURAL POSTURE: Plaintiff moved for reargument of an order on the issue of whether he had a proper purpose for seeking to inspect the books and records of defendant corporation under *Del. Code Ann. tit. 8, § 220.*

OVERVIEW: Trial in the plaintiff's consolidated action was delayed due to the parties' efforts to resolve their dispute amicably and a related stay of the litigation. As it happened, the delay served to moot the plaintiff's request. Consequently, the court's views expressed at the hearing about the plaintiff's purpose in making his *§ 220(d)* demand, and the recapitulation of those views were mere dicta and did not constitute judicial findings that could have preclusive effect in any other litigation between the parties.

OUTCOME: The motion was denied, except to the extent that the final order was modified to include a new paragraph dismissing the complaint as moot.

LexisNexis(R) Headnotes

*Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend*
[HN1] A court may grant reargument or reconsideration when it appears that it overlooked or misapprehended the factual or the legal principles governing the disposition of the motion. The standard is flexible, allowing the court to grant a motion for reargument or reconsideration if the court has overlooked a decision or principle of law that would have a controlling effect or the court has misapprehended the law or the facts so that the outcome of the decision would be affected.

COUNSEL: A. Thompson Bayliss, Esquire, Abrams & Laster LLP, Wilmington, DE.

Cathy L. Reese, Esquire, Fish & Richardson PC, Wilmington, DE.

Michael J. Maimone, Esquire, Edwards Angell Palmer & Dodge LLP, Wilmington, DE.

JUDGES: Stephen P. Lamb, Vice Chancellor.

OPINION BY: Stephen P. Lamb

## OPINION

Plaintiff Richard Schoon has moved for reargument of the court's memorandum opinion and order of June 27, 2006 ("Memorandum Opinion"), "on the issue of whether he had a proper purpose for seeking to inspect the books and records of defendant Troy Corporation." In support of his motion, Schoon's counsel submitted a 16-page brief and an appendix of 25 documents. Troy's counsel responded with an even longer brief and an even more voluminous appendix.

[HN1] A court may grant reargument or reconsideration when it appears that the court "overlooked or misapprehended the factual or the legal principles governing the disposition of the motion." [1] The standard is flexible, allowing the court to grant a motion for reargument or reconsideration if the "court has overlooked a decision or principle of law that [*2] would have a controlling effect or the court has misapprehended the law or the facts so that the outcome of the decision would be affected." [2]

> 1 *VGS, Inc. v. Castiel, 2003 Del. Ch. LEXIS 31, 2003 WL 1794210, at * 1 (Del. Ch. Mar. 27, 2003).*
> 2 *Id.*

Trial in this consolidated action was delayed due to the parties' efforts to resolve their dispute amicably and a related stay of the litigation. As it happened, this delay served to moot Schoon's request, as all parties recognize. Thus, at the time of the post-trial argument, Schoon's counsel represented there was no part of Schoon's request that was "still viable." [3] In other words, by the time of trial and post-trial argument, Schoon's complaint was moot.

> 3 Tr. of June 8, 2006 hearing at 91.

In light of this fact, the court's views expressed at the June 8 hearing about Schoon's [*3] purpose in making his demand, and the recapitulation of those views at pages 3-4 of the Memorandum Opinion are mere *dicta* and do not constitute judicial findings that could have preclusive effect in any other litigation between these parties. That conclusion is further evidenced by the fact that Section IV of the Memorandum Opinion, summarizing the holding, makes no mention of Schoon or his claim.

With this clarification, the motion for reargument is DENIED, except to the extent that the Final Order entered July 17, 2006, shall be and hereby is modified to include a new paragraph 16 as follows:

> 16. The complaint of Richard Schoon filed pursuant to *8 Del. C. § 220(d)*, on September 29, 2005, is dismissed as moot.

IT IS SO ORDERED.

/s/ Stephen P. Lamb

Vice Chancellor