

TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, and TRANS-RESOURCES, INC., Plaintiffs, v. ARIE GENGER, Defendant. ARIE GENGER, Counterclaim Plaintiff, v. TR INVESTORS, LLC, GLENCLOVA INVESTMENT CO., NEW TR EQUITY I, LLC, NEW TR EQUITY II, LLC, and TRANS-RESOURCES, INC., Counterclaim Defendant.

Civil Action No. 3994-VCS

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*2009 Del. Ch. LEXIS 203*

October 30, 2009, Submitted
December 9, 2009, Decided

**NOTICE:**

THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**SUBSEQUENT HISTORY:** Clarified by *TR Investors v. Genger, 2010 Del. Ch. LEXIS 19 (Del. Ch., Feb. 3, 2010)*

**PRIOR HISTORY:** *TR Investors, LLC v. Arie, 2009 Del. Ch. LEXIS 230 (Del. Ch., Mar. 4, 2009)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff corporate investors filed a motion for contempt pursuant to Del. Ch. Ct. R. 70(b) and a motion for spoliation against defendant former CEO in an action under *Del. Code Ann. tit. 8, § 225* regarding control of a corporation the former CEO had founded. The corporate investors claimed that the CEO violated a status quo order by permanently overwriting data on the unallocated space of the corporation's server and the CEO's computer.

**OVERVIEW:** The investors acquired a majority of the corporation's stock and proposed to reconstitute the board of directors, effectively removing the CEO from the board. The proposal was rejected and the investors filed the *§ 225* action. The parties stipulated to the status quo order that was implemented. The CEO claimed that he was concerned about safeguarding his non-corporation documents that were stored on the corporation computer system when he authorized his computer consultant to run wiping software that permanently erased the files from the unallocated space of the system. The chancery court concluded that the CEO also intended to narrow the information base available to the investors in the *§ 225* action by destroying evidence that was likely relevant to the action. An adverse inference sanction for spoliation was appropriate because the CEO knew that he had a clear duty to preserve evidence and intentionally deleted the computer data. Additionally, the CEO had to allow the investors access to certain disputed documents, the CEO's burden of persuasion was elevated by one level on any affirmative defense or counterclaim, and the investors were awarded attorneys' fees.

**OUTCOME:** The motions for contempt and spoliation were granted.

**LexisNexis(R) Headnotes**

*Civil Procedure > Sanctions > Contempt > Civil Contempt*
*Evidence > Procedural Considerations > Burdens of Proof > Burden Shifting*
*Evidence > Procedural Considerations > Burdens of Proof > Clear & Convincing Proof*
[HN1] To establish civil contempt, a petitioning party must demonstrate that the contemnors violated an order of a court of which they had notice and by which they were bound. Del. Ch. Ct. R. 70(b) supplies the Delaware Chancery Court with the power -- and broad latitude -- to remedy violations of its orders. A party petitioning for a finding of contempt bears the burden to show contempt by clear and convincing evidence; the burden then shifts to the contemnors to show why they were unable to comply with the order.

*Civil Procedure > Judicial Officers > Judges > Discretion*
*Civil Procedure > Judgments > Entry of Judgments > General Overview*
*Civil Procedure > Sanctions > General Overview*
[HN2] A trial judge has broad discretion to impose sanctions for failure to abide by its orders, so long as the sanctions are just and reasonable. The entry of judgment as a consequence is appropriate only where there is an element of willfulness or conscious disregard of a court order by a party.

*Civil Procedure > Sanctions > Contempt > Civil Contempt*
[HN3] The purpose of a civil, as opposed to criminal, contempt determination must be coercive or remedial. Therefore, an aggrieved party must also show that the sanction desired is coercive or remedial, as opposed to punitive.

*Civil Procedure > Sanctions > Contempt > Civil Contempt*
[HN4] "No harm, no foul" is not a cognizable defense to a contempt allegation.

*Civil Procedure > Sanctions > General Overview*
[HN5] Violating a court order is a serious matter and one worthy of appropriate sanctions.

*Civil Procedure > Discovery > Electronic Discovery > Preservation*
*Civil Procedure > Discovery > Relevance*
*Civil Procedure > Sanctions > General Overview*
[HN6] A party in litigation or who has reason to anticipate litigation has an affirmative duty to preserve evidence that might be relevant to the issues in the lawsuit. Often, this duty attaches even before litigation has been commenced when a party should have known that the evidence may be relevant to future litigation. A party does not, however, have a duty to preserve every shred of paper, every email or electronic document, but instead must preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request.

*Civil Procedure > Discovery > Misconduct*
*Civil Procedure > Sanctions > Misconduct & Unethical Behavior > General Overview*
*Evidence > Relevance > Spoliation*
[HN7] Dispositive sanctions, including dismissal of claims or imposition of an adverse inference, are only appropriate where a party acts to intentionally or recklessly destroy evidence, when it knows that the item in question is relevant to a legal dispute or it was otherwise under a legal duty to preserve the item. Delaware courts have defined recklessness in the spoliation context as a conscious awareness of the risk that one's action or inaction may cause evidence to be despoiled. Intentional destruction simply means that the spoliator acted with purpose. Additionally, to obtain an adverse inference, the aggrieved party must make some showing that the allegedly destroyed evidence existed and supported the aggrieved party's position. If a party intentionally destroys evidence, then a court must "adopt a view of the facts as unfavorable to the wrongdoer as the known circumstances will reasonably admit.

*Civil Procedure > Discovery > Misconduct*
*Civil Procedure > Sanctions > Contempt > Civil Contempt*
*Evidence > Relevance > Spoliation*
[HN8] A court has inherent power to fashion a remedy for contempt that is proportionate to the level of harm committed so long as the court exercises restraint. In determining what remedy to award for spoliation, the

court should consider: (1) the culpability of the spoliating party; (2) the degree of prejudice suffered by the aggrieved party; and (3) the availability of lesser sanctions that could both avoid unfairness to the aggrieved party and serve as an adequate penalty to deter such future conduct.

**COUNSEL:** [*1] Thomas J. Allingham II, Esquire, Anthony W. Clark, Esquire, Robert A. Weber, Esquire, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware, Attorneys for Plaintiffs.

Donald J. Wolfe, Jr., Esquire, Brian C. Ralston, Esquire, Scott B. Czerwonka, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Michael P. Carroll, Esquire, Avi Gesser, Esquire, DAVIS POLK & WARDWELL LLP, New York, New York, Attorneys for Defendant.

**JUDGES:** Vice Chancellor STRINE.

**OPINION BY:** Strine

**OPINION**

MEMORANDUM OPINION

**STRINE, Vice Chancellor.**

I. Introduction

Plaintiffs TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC, New TR Equity II, LLC, and Trans-Resources, Inc. (collectively, the "Trump Group") seek sanctions against defendant Arie Genger for causing computer "wiping" software to be employed to destroy all the information on the unallocated space of TRI's computer database. Genger's conduct occurred in the midst of expedited litigation over the control of Trans-Resources, Inc. (or "TRI"). In connection with that litigation under *8 Del. C. § 225*, attorneys [*2] for TRI worked with Genger throughout the weekend of September 5-7, 2008 to identify and segregate documents on TRI's computer system that were personal to Genger and not related to the business or affairs of TRI. This work was in anticipation of Genger's potential involuntary relinquishment of control over TRI to the Trump Group.

After the attorneys for TRI had left on September 7, 2008, Genger had a conversation with Oren Ohana -- the

computer consultant he had long employed to assist both TRI and himself personally -- about the computer work the attorneys (and their technology consultants) had performed throughout the weekend. As a result of that discussion, Ohana was authorized by Genger to take measures to destroy information on TRI's computer system. That conduct was a violation of a status quo order entered on August 29, 2008 (the "August Status Quo Order") in connection with the *§ 225* dispute, which provided in relevant part that "the parties to the *[§ 225* dispute] . . . are hereby restrained and enjoined from, directly or indirectly . . . tampering with, destroying or in any way disposing of any Company-related documents." 1 Before embarking on that course of document destruction, [*3] Genger did not consult with counsel for TRI despite his awareness of the terms of the August Status Quo Order, and the fact that counsel had been working with him throughout the weekend of September 5, 2008. Consistent with Genger's failure to consult counsel before acting, Ohana acted in the dead of night to wipe the unallocated portions of the TRI server clean. Like people who do things in the dark that they do not wish others to know about, neither Genger nor Ohana later informed TRI, its counsel, or the Trump Group about the use of the wiping software. In other words, Genger and Ohana tried to keep their activities secret.

1 JX-2 (Status Quo Order (Aug. 28, 2009)).

But, once the Trump Group gained control over TRI, the wiping activity came to light. The revelation of this misconduct coincided with the unraveling of a settlement of the *§ 225* action, and has resulted in an expensive case within a case. While the parties dueled over whether the Trump Group properly exercised consents to replace the TRI board, they also spent enormous resources on whether Genger's actions constituted contempt of court and spoliation of evidence and, if so, what the appropriate consequences were.

In this [*4] opinion, I resolve the parties' feud regarding Genger's destruction of information. Although I reject the Trump Group's preferred remedy of entering a default judgment against Genger in the *§ 225* action, I conclude that a potent remedy is justified by Genger's intentional violation of a clear judicial order and contempt of this court. Moreover, I conclude that Genger intentionally sought to reduce the base of information available to the Trump Group in the *§ 225* action, and that, even more indisputably, his conduct was reckless --

both findings that render him accountable for spoliation.

In the § 225 action, Genger contends, through a variety of legal and equitable theories, that the Trump Group does not have majority voting power despite ownership of a majority of the equity of TRI. Because Genger's destructive conduct had the effect of preventing the Trump Group's access to the full array of information that should have been available in the § 225 action, I conclude that a proportionate and fitting remedy is to require Genger, as to any affirmative defense or counterclaim raised by him in the § 225 action, to meet his burden of persuasion by meeting an evidentiary burden one level [*5] higher than would otherwise be applicable. Thus, if Genger would otherwise have to meet a mere preponderance standard, he will now have to prevail by producing clear and convincing evidence. Additionally, because his secretive conduct has left me with serious doubts about his credibility and because that conduct rendered the documentary record incomplete, Genger will be unable to meet his burden of persuasion if the only evidence on a contested matter is his own testimony. Rather, he will need to present corroborating evidence, either in the form of documents or another person's testimony, to meet his burden. To supplement this relief and directly address Genger's shrinking of the evidentiary record, I order Genger to turn over certain relevant documents to which he had made a claim of privilege.

Having found Genger to be in contempt and to have destroyed relevant evidence, I must also balance his actions against some disconcerting actions of the Trump Group following Genger's violations. In rejecting a more extreme order, I give weight to conduct by the Trump Group after they took over control of TRI. That conduct, while in a grayer area than Genger's, also showed disrespect for stipulated [*6] court orders, illustrating the high stakes the Trump Group and Genger place on their dispute over control of TRI and both side's willingness to employ sharp elbows. Although not a factor that disentitles it from any relief at all, the Trump Group's behavior convinces me that justice requires that an adjudication resolve this ownership disagreement, if, as seems likely, the Trump Group and Genger are unable to settle their differences in a rational, consensual manner.

Finally, because Genger violated an important order of this court and failed to own up for his misconduct in a timely way, an award of attorneys' fees is warranted. In that connection, I suggest an amount that strikes me as reasonable in light of what was at stake, and that is consistent with my impression that both sides have engaged in overkill.

## II. Factual Background

These are the facts as I find them after trial.

### A. The Trump Group Purports To Remove Genger From The TRI Board Of Directors

As of June 2008, defendant Arie Genger was the Chief Executive Officer of TRI, a company that he founded. At that time, the Trump Group owned a large, but non-majority, bloc of the outstanding TRI stock. [2] The Trump Group brought large [*7] amounts of financial capital to the table that helped TRI out of an earlier credit crunch, and that resulted in its ownership of its initial 47% interest in TRI. From the record, one senses that Genger and the Trump Group bring a similar mindset to business. Although they seemed to work together cooperatively to advance TRI's interests, Genger and the Trump Group viewed business as business, and neither would hesitate to seize an advantage, even if that advantage meant causing commercial injury to someone else, regardless of whether one had served with that someone else on a board for several years.

2  Tr. at 140:15-17 (Hirsch).

In 2007 and 2008, TRI fell behind in making payments to its largest lender, Bank Hapoalim. [3] In the spring and summer of 2008, the Trump Group and Genger began to work together to re-finance TRI's debt to Bank Hapoalim. [4] One difficulty that both Genger and the Trump Group were interested in avoiding was putting in place a change in ownership structure that might inspire a legal challenge from Sagi Genger, Genger's son. [5] Arie Genger had a bitter divorce from Sagi's mother, and has been estranged from his son for several years. It seems that as of this time, the [*8] Trump Group favored continuing Genger as CEO and working together with him to determine TRI's fate. But the effort to consummate a Genger/Trump Group-sponsored refinancing deal began to unwind in late June 2008 and, ultimately, the parties abandoned these efforts. [6]

3  *Id.* at 142:4-24.
4  *Id.* at 147:6-149:6.
5  *Id.* at 152:9-153:15.

6  *Id.* at 162:2-163:20.

With a refinancing out of reach and TRI facing the potential for its creditors to take adverse action, the Trump Group shifted course in a major way. Litigation in this court and another forum broke out in early August 2008 between the Trump Group and Genger over TRI. Then, without any advance notice to Genger, on August 22, 2008, the Trump Group purchased an additional 19% bloc of TRI shares from a trust to benefit Sagi, called the Sagi Genger Trust, for $ 26.7 million. [7] This bloc of shares will feature prominently in the upcoming *§ 225* trial, because it was transferred by Arie Genger to the trust in connection with his divorce from Sagi's mother, Dalia Barshishat. Arie Genger and the Trump Group have sharply differing views about who gets to vote this bloc. For now, suffice it to say that the Trump Group believed that the purchase of this bloc, [*9] along with other shares they own, gave it sufficient voting control of TRI to remove the TRI board and install a new board. [8] As of August 25, 2008, the original board consisted of five members: Genger and his trusted business associates William Dowd and Avi Pelossof, as well as Robert Smith and Jules Trump, both appointees of the Trump Group.

7  *Id.* at 140:18-141:4, 163:21-164:10.
8  *Id.* at 164:12-165:14.

At a board of directors meeting held on August 25, 2008, the Trump Group delivered written consents of its shares, including those acquired from the Sagi Genger Trust, and proposed to reconstitute TRI's board as follows: first, the Trump proposed to increase the number of directors on the board from five to six; second, the Trump Group proposed to remove Arie Genger from the board and from his position as CEO; and third, the Trump Group proposed that Eddie Trump and Mark Hirsch would take the two new seats on the TRI board. [9] Because Eddie Trump and Mark Hirsch were Trump Group appointees, the practical effect of this proposal was to eliminate Genger's control over TRI. At the August 28, 2008 meeting, Genger, Pessolof, and Dowd rejected the proposal, believing that the Trump Group did not [*10] have the voting power to reconstitute the board.

9  Pl. Compl. at Ex. A (Action by Written Consent of the Stockholders of [TRI] (Aug. 25, 2008)).

B. The *Section 225* Action Is Filed And A Status Quo Order Is Implemented

TR Investors, LLC, Glenclova Investment Co., New TR Equity I, LLC, and New TR Equity II, LLC promptly filed the *§ 225* action on August 25, 2008, asking, among other things, for this court to: (a) declare the Trump Group the majority stockholder of TRI; (b) enjoin TRI from recognizing Genger as a director; (c) declare them entitled, as the majority shareholders, to designate and elect two more of their designees to the TRI board, and to continue the terms of Jules Trump and Robert Smith; (d) declare the TRI board to be composed of their four designees -- Jules Trump, Robert Smith, Mark Hirsch, and Eddie Trump -- plus William Dowd and Avi Pelossof; and (e) declare invalid any actions taken by a board not comprised of their designees from and after the August 25, 2008 delivery of their written consents. On August 26, 2008, the Trump Group also filed an action under *8 Del. C. § 220* asking, among other things, for this court to order TRI to permit it to inspect and copy books [*11] and records from TRI.

On August 28, 2008, the parties to the *§ 225* action entered into a Standstill Agreement, which was scheduled to terminate on September 4, 2008, for the purpose of giving the disputing parties time to try to settle their dispute and, until such settlement was reached or the *§ 225* action completed, to sort out how TRI would be managed. This Standstill Agreement provided, among other things, "[e]xcept as otherwise provided herein, no action will be taken to prosecute or defend any of the Litigations during the Term of this Agreement." [10] The next day, the parties submitted a stipulated status quo order (the aforementioned "August Status Quo Order"). Importantly, the August Status Quo Order had a provision that is standard when parties are disputing the control of a business and where there exists a motive for the destruction of unfavorable information. That provision states in relevant part:

> Unless and until otherwise ordered by the Court or agreed to in writing by each of the parties to the above action, the plaintiffs and the defendants, and their respective officers, directors, agents, servants, subsidiaries, affiliates, employees, attorneys, advisors and all persons [*12] acting in concert or participation with any of them, and each of their successors and assigns, are hereby

restrained and enjoined from, directly or indirectly . . . tampering with, destroying or in any way disposing of any Company-related documents, books or records . . . . [11]

10  JX-1 (Standstill Agreement (Aug. 28, 2009)).
11  August Status Quo Order at P 1.

Because neither settlement nor a favorable verdict in the § 225 action were guaranteed, Genger faced the possibility that he might lose control of the company he founded twenty-five years ago. Relatedly, Genger faced the prospect that the Trump Group, if it assumed control, would review the documents and files he had accumulated over the twenty-five years he had spent at TRI, not to mention the chance that they would get to see those documents as a result of discovery in the pending litigations. Therefore, at the direction of TRI's outside counsel, Friedman Kaplan Seiler & Adelman LLP ("Friedman Kaplan"), on the weekend of September 5-7, 2008, the entire contents of Genger's TRI office -- both physical and electronic -- were packaged, sealed, and sent to the office of Genger's personal counsel, Dechert LLP pending the outcome of the [*13] lawsuits. The goal of Friedman Kaplan's efforts was not only to segregate the non-TRI documents and to protect Genger's interest in keeping those documents confidential, but also to ensure that all of the documents relevant to TRI's business and affairs were preserved and available both for those managing the corporation and for possible use as evidence by the parties in the pending litigation.

C. Genger Allows Files To Be Erased From His Computer At TRI In Violation Of The August Status Quo Order

1. Genger Has Unusual Concerns About His Personal Documents At TRI

Aside from the usual motivations that pertain in these situations, Genger had special concerns that made him reluctant to permit the Trump Group to control TRI because the Trump Group would have access to personal electronic documents that Genger had generated while at TRI. Although Mike Myers may have made millions by bringing to the big screen his take on what it is like to be an "international man of mystery," Arie Genger, as it turns out, is such a man. Aside from his business

interests, Genger apparently has high level contacts within the Israeli government for whom he performed sensitive tasks relating to Israel's national [*14] security. It seems that these tasks involved work by Genger within the United States -- apparently on a secret basis -- although there is no indication in the record that Genger has openly identified his work to anyone of authority in the United States or has diplomatic or other official credentials. What this work involved is unknown to me, but what is known is that Genger used TRI's computer system to create and receive documents implicating Israel's national security.

Genger also had personal documents relating to his family finances and divorce dispute on the TRI system. Although Genger's use of TRI's computer system for these personal purposes was a violation of TRI's policies for computer use as articulated by Genger himself, Genger had breached these policies pervasively. He was worried that the Trump Group would gain access to his personal documents, and, through his lawyers, Genger voiced concern about the security of these documents in view of the Trump Group's possible impending control of TRI.

2. Steps Were Taken To Preserve Relevant Information

Because of the ongoing dispute and his possible departure from TRI, Genger needed to gather his personal effects and desired to protect [*15] his personal documents, including those that involved his work for the Israeli government. At the same time, safeguards were needed to ensure that Genger did not leave with documents relevant to TRI's business and affairs. To help protect the integrity of this process of information segregation, attorneys from Friedman Kaplan were charged with supervising the process by which Genger would remove his personal materials from TRI's offices. Most pertinent to the current dispute, Friedman Kaplan reviewed TRI's electronic files with the goal of identifying those of Genger's documents that were purely personal. Those personal documents were then to be encrypted in a manner that ensured that the confidentiality of those documents would be protected. As to non-personal documents, it was Friedman Kaplan's task to preserve those documents for use by TRI in its business and to ensure they were available if relevant in the pending litigations. To do that, attorneys opened documents and e-mails that were potential targets for encryption to review their contents. [12]

12 JX-5 at PP 8-10 (Ohana Aff. (Oct. 20, 2008)).

This process was a hurried one that was largely accomplished during the weekend of Friday, [*16] September 5, 2008 through Sunday, September 7, 2008, with Friedman Kaplan endeavoring to complete the review and encryption process before Monday, September 8, 2008, when the Trump Group's purportedly reconstituted board was scheduled to meet. To assist in its efforts, Friedman Kaplan employed an outside technology firm, Kraft & Kennedy, Inc. ("K & K"), to preserve Genger's electronic files and e-mails and, where necessary, to separate and encrypt Genger's personal files from his TRI-related files. 13

13 JX-7 at PP 1-4 (Leicht Aff. (Oct. 31, 2008)); Tr. at 251:6-252:11 (Genger).

As part of the preservation process, K & K "imaged" 14 parts of TRI's computer system on September 7, 2008 in order to have a "snapshot" of everything on the system as of that date. 15 Specifically, K & K imaged hard drives of various computers at TRI, including Genger's computer's hard drive and the TRI server's hard drive. 16 But K & K did not do a complete job, as will soon be discussed, perhaps in part because it did not have a deep understanding of how TRI maintained its computer records.

14 The "images" taken were digital pictures of the computers' hard drives. These digital pictures are essentially exact [*17] copies of the computers' hard drives, which computer technicians can then use to reconstruct and examine the data stored on the drives.

15 JX-7 at PP 2-3 (Leicht Aff. (Oct. 31, 2008)).

16 A computer server is a computer with a large amount of memory that runs the operating system and other software programs for individual computers. These individual computers are often linked to one another by an electronic network. The server often stores the data for the entire network and for all users. Thus, for example, saving a file to the network from Genger's computer would allow another user to access that saved data from another computer linked to the same server.

The person who did fully understand how TRI maintained its computer records was Oren Ohana, who had served for years as a technology consultant for both

TRI and Genger personally. Genger trusted Ohana, and Ohana had established protocols for Genger to use in his own handling of important documents. Genger was in contact with Ohana throughout the document review process on the weekend of September 5, 2008. 17

17 See JX-22 (e-mail between Arie Genger and Oren Ohana (Sept. 4, 2008)) (asking Genger, "[c]an I call you[?]"); JX-23 (e-mail between [*18] Arie Genger and Amir Shvetz, an Ohana employee (Sept. 5, 2008)); JX-25 (e-mails between Arie Genger and Amir Shvetz, an Ohana employee (Sept. 5-6, 2008)).

3. Temporary Files Were Stored On The Unallocated Space Of Genger's Hard Drive

To understand the present dispute's origins -- the events of the weekend of September 5, 2008 -- one must grasp the key point that the deletion of a document or e-mail from the active space of a computer's hard drive or from a server does not mean that that the deleted file or e-mail is no longer retrievable from the computer system.

By way of a directly relevant example, if the Friedman Kaplan attorneys opened a document on Genger's computer from his files that weekend to review whether it was confidential and kept it open long enough for the program's autosave feature to function, the computer system would create a temporary copy of that file on Genger's computer. These temporary copies are different than normal user-created files, such as word-processing documents. A user-created document is stored on the active, or allocated, space, of a computer or server where it is visible to a user. A temporary file, however, is only in the active, or allocated, space [*19] so long as the file is open. When the file is closed by the user, the recently created temporary copy (or its contents) physically, or digitally, remains in the inactive, or unallocated, space of the machine's hard drive where it stays, invisible to the user, until the computer needs that space to run a process or store another file. When the computer needs this space, it overwrites the previous data that had been stored on that portion of the unallocated space, and this process starts anew. Additionally, when a user deletes a file from his or her computer or a server (e.g., deletes a file from the "trash bin"), the data from that file remains -- as it was -- in what is now the unallocated space. Data in the unallocated space is not visible to normal users, but can be recovered with the aid of technology consultants like Ohana or K & K.

segregated segment of the computer's hard drive dedicated to the computer's e-mail program. The e-mail programs themselves create files for different e-mail users or e-mail accounts, but these files (and their unallocated space) are much smaller [*20] than the computer's main unallocated space section. Therefore, files in the smaller, unallocated space on the computer's hard drive reserved for e-mails, such as deleted e-mail messages, get overwritten much faster as a result of normal usage.

To narrow the factual disputes between the parties about technological issues, I directed the parties to identify a neutral, independent IT consultant -- ultimately, Protiviti, Inc., a risk and business consulting firm -- to facilitate the exchange of electronic information between the parties. The expert report Protiviti concluded that non-encrypted copies of a document then

unallocated space on the TRI server was likely filled with several months of TRI-related data as of September 7, 2008.

20 Tr. at 54:14-55:6 (Faulkner).

4. Ohana Removes The Temporary Files Stored On Genger's Hard Drive

Genger's advisor Ohana was keenly aware of how and where TRI stores its electronic files [*22] and e-mails. And, on Sunday, September 7, 2008, Ohana actually joined Genger, Friedman Kaplan, and K & K for parts of the review process. During the time that Friedman Kaplan and K & K were there, Ohana did not express any concerns to them about the possibility that

restrained and enjoined from, directly or indirectly . . . tampering with, destroying or in any way disposing of any Company-related documents, books or records . . . . [11]

10  JX-1 (Standstill Agreement (Aug. 28, 2009)).
11  August Status Quo Order at P 1.

Because neither settlement nor a favorable verdict in the § 225 action were guaranteed, Genger faced the possibility that he might lose control of the company he founded twenty-five years ago. Relatedly, Genger faced the prospect that the Trump Group, if it assumed control, would review the documents and files he had accumulated over the twenty-five years he had spent at TRI, not to mention the chance that they would get to see those documents as a result of discovery in the pending litigations. Therefore, at the direction of TRI's outside counsel, Friedman Kaplan Seiler & Adelman LLP ("Friedman Kaplan"), on the weekend of September 5-7, 2008, the entire contents of Genger's TRI office -- both physical and electronic -- were packaged, sealed, and sent to the office of Genger's personal counsel, Dechert LLP pending the outcome of the [*13] lawsuits. The goal of Friedman Kaplan's efforts was not only to segregate the non-TRI documents and to protect Genger's interest in keeping those documents confidential, but also to ensure that all of the documents relevant to TRI's business and affairs were preserved and available both for those managing the corporation and for possible use as evidence by the parties in the pending litigation.

## C. Genger Allows Files To Be Erased From His Computer At TRI In Violation Of The August Status Quo Order

### 1. Genger Has Unusual Concerns About His Personal Documents At TRI

Aside from the usual motivations that pertain in these situations, Genger had special concerns that made him reluctant to permit the Trump Group to control TRI because the Trump Group would have access to personal electronic documents that Genger had generated while at TRI. Although Mike Myers may have made millions by bringing to the big screen his take on what it is like to be an "international man of mystery," Arie Genger, as it turns out, is such a man. Aside from his business

interests, Genger apparently has high level contacts within the Israeli government for whom he performed sensitive tasks relating to Israel's national [*14] security. It seems that these tasks involved work by Genger within the United States -- apparently on a secret basis -- although there is no indication in the record that Genger has openly identified his work to anyone of authority in the United States or has diplomatic or other official credentials. What this work involved is unknown to me, but what is known is that Genger used TRI's computer system to create and receive documents implicating Israel's national security.

Genger also had personal documents relating to his family finances and divorce dispute on the TRI system. Although Genger's use of TRI's computer system for these personal purposes was a violation of TRI's policies for computer use as articulated by Genger himself, Genger had breached these policies pervasively. He was worried that the Trump Group would gain access to his personal documents, and, through his lawyers, Genger voiced concern about the security of these documents in view of the Trump Group's possible impending control of TRI.

### 2. Steps Were Taken To Preserve Relevant Information

Because of the ongoing dispute and his possible departure from TRI, Genger needed to gather his personal effects and desired to protect [*15] his personal documents, including those that involved his work for the Israeli government. At the same time, safeguards were needed to ensure that Genger did not leave with documents relevant to TRI's business and affairs. To help protect the integrity of this process of information segregation, attorneys from Friedman Kaplan were charged with supervising the process by which Genger would remove his personal materials from TRI's offices. Most pertinent to the current dispute, Friedman Kaplan reviewed TRI's electronic files with the goal of identifying those of Genger's documents that were purely personal. Those personal documents were then to be encrypted in a manner that ensured that the confidentiality of those documents would be protected. As to non-personal documents, it was Friedman Kaplan's task to preserve those documents for use by TRI in its business and to ensure they were available if relevant in the pending litigations. To do that, attorneys opened documents and e-mails that were potential targets for encryption to review their contents. [12]

Although e-mails and e-mail attachments also create temporary files, they are contained within a smaller, segregated segment of the computer's hard drive dedicated to the computer's e-mail program. The e-mail programs themselves create files for different e-mail users or e-mail accounts, but these files (and their unallocated space) are much smaller [*20] than the computer's main unallocated space section. Therefore, files in the smaller, unallocated space on the computer's hard drive reserved for e-mails, such as deleted e-mail messages, get overwritten much faster as a result of normal usage.

To narrow the factual disputes between the parties about technological issues, I directed the parties to identify a neutral, independent IT consultant -- ultimately, Protiviti, Inc., a risk and business consulting firm -- to facilitate the exchange of electronic information between the parties. [18] In its expert report, Protiviti concluded that non-encrypted copies of Genger's documents could have been created during the encryption process. [19] This inadvertent creation of temporary copies would have defeated the point of the encryption process because, as discussed above, trained computer technicians would be able to obtain access to these confidential files even without the encryption key.

> 18   Stipulation and Confidentiality Order Governing the Exchange of Certain Information (Mar. 3, 2009) at P 5.
>
> 19   JX-19 (expert report of Kevin Faulkner) at 13.

The possibility of extra, or unintentional, copies of various files -- temporary or deleted files, for [*21] example -- also applies to Genger's TRI-related work. During the September 5-7 review process, temporary copies of TRI-related files (i.e., not personal Genger documents) would have been created. These temporary copies would have remained on the computer's unallocated space at the conclusion of the weekend.

Even more importantly, Genger and others at TRI would almost certainly have created many such TRI-related documents *before* the August Status Quo Order had been entered, simply by their normal computer usage. [20] The information on the unallocated space of the TRI system therefore acted somewhat as a back-stop reservoir of documents that had been deleted from the active files of TRI users. Although users may have believed that their deletion activity rendered the affected

documents irretrievable, that was not so -- as long as the unallocated space had sufficient room to store them. The unallocated space on the TRI server was likely filled with several months of TRI-related data as of September 7, 2008.

> 20   Tr. at 54:14-55:6 (Faulkner).

4. Ohana Removes The Temporary Files Stored On Genger's Hard Drive

Genger's advisor Ohana was keenly aware of how and where TRI stores its electronic files [*22] and e-mails. And, on Sunday, September 7, 2008, Ohana actually joined Genger, Friedman Kaplan, and K & K for parts of the review process. During the time that Friedman Kaplan and K & K were there, Ohana did not express any concerns to them about the possibility that unencrypted versions of Genger's files were being created during the review process.

But after the attorneys and K & K had left TRI's offices, Genger claims that Ohana informed him that non-encrypted copies of Genger's personal files may have been created and left on the unallocated space of his computer and the TRI server. [21] Ohana recommended that he "take care of" the problem by "wiping" the unallocated space on both machines, and Genger agreed with Ohana's suggested course of action. [22] At around 1:00 a.m. on September 8, 2008, Ohana ran a wiping software program called "SecureClean," and selected the "DeepClean" option (the most thorough) for use on the hard drive of Genger's computer. [23] Ohana then ran SecureClean on the hard drive of TRI's server on September 10, 2008. [24] This option permanently overwrites -- or, effectively erases -- data on the unallocated space of a hard drive by saving new strings of unintelligible [*23] data on that unallocated space. [25]

> 21   JX-5 at P 13 (Ohana Aff. (Oct. 20, 2008)); JX-20 at PP 12-14 (Genger Aff. (Oct. 31, 2008)); Tr. at 256:4-13 (Genger).
> 22   JX-5 at P 13 (Ohana Aff. (Oct. 20, 2008)); JX-20 at PP 12-14 (Genger Aff. (Oct. 31, 2008)); Tr. at 257:4-258:2 (Genger).
> 23   JX-5 at P 6 (Ohana Aff. (Oct. 20, 2008)); JX-19 at 15-16 (expert report of Kevin Faulkner).
> 24   JX-19 at 15-16 (expert report of Kevin Faulkner); *see* JX-5 at P 15 (Ohana Aff. (Oct. 20, 2008)).
> 25   Tr. at 8:21-9:10 (Faulkner).

Neither Ohana nor Genger spoke with Friedman Kaplan, K & K, or even Genger's own lawyers before Ohana ran SecureClean on September 8 and 10, 2008. Genger did not seek advice from Friedman Kaplan about whether getting rid of files, even copies, was permissible under the terms of the August Status Quo Order, despite knowing that Friedman Kaplan had been charged with ensuring compliance with the August Status Quo Order and the preservation of documents.

Notably, neither Ohana nor Genger disclosed their conduct after the fact. That is, they did not leave a note saying "oh by the way, we wiped clean the unallocated space during the dead of night." Rather, they kept their furtive conduct secret.

Their destructive [*24] conduct was especially harmful because K & K had not preserved an image of the entire TRI hard drive. K & K had only preserved an image of the active files on the TRI system, and the information on the unallocated space had not been imaged or reviewed. Furthermore, the review process did not include the information on TRI's e-mail server, because, unknown to K & K and Friedman Kaplan -- but known to Ohana and therefore likely his client, Genger -- the e-mail server was maintained at an off-site facility controlled by Ohana.

It is difficult to determine whether Genger and Ohana knew before running SecureClean that K & K had not imaged the unallocated space of Genger's computer or the TRI server. For his part, Genger pleads computer ignorance, claiming only to have thought that Ohana was getting rid of "copies" of information that was encrypted, and that the underlying originals were preserved. Genger's lawyers even tried to convince me that Genger was unaware that Ohana would be using a form of deletion software, suggesting that he believed Ohana had somehow engaged in a more targeted deletion effort. In support of their argument that Genger had no intent to destroy evidence relevant [*25] to the § 225 dispute, his lawyers point to the lack of any evidence that Genger deleted a large amount of documents before his departure from TRI. Such a pattern, of course, would have provided support for a motive for the use of SecureClean as it would have completed the job of eradicating traces of documents Genger had deleted from the active files of TRI. Ohana claims that he simply intended to erase the temporary versions of the encrypted files that may have been created during the review process. [26]

26  JX-5 at P 13 (Ohana Aff. (Oct. 20, 2008)).

Although I am not free from all doubt on the point, I do not, in the end, embrace Genger's version of events. He is a very sophisticated man who operates in the national security field. Precisely because he recognizes the importance of computer security, he has employed Ohana as an advisor for many years. The fact that Genger is not a computer expert does not mean that he does not understand that there are products that can erase documents; he has someone like Ohana at his disposal precisely to bring to bear the specific skills that Genger himself lacks.

Genger and Ohana were both involved in the document review process, but Ohana was not continuously [*26] involved. It therefore makes no sense that Ohana could easily find and delete simply those copies of the documents that were encrypted. If that were the case, there was no reason for them not to have called Friedman Kaplan and K & K, asked them to come back in the office, and done it in an above-board way. Certainly, that could have been done on September 9, before the final wiping on September 10. The idea that Genger was reluctant (because of the sensitivities about the work strain it would impose) to burden them further with a discussion of whether the wiping was proper makes no sense and has no credible basis. Likewise, if (as I find) Genger knew that Ohana would run a computer program that deleted all the information on the unallocated space and believed (as I do not find) that there was nothing wrong with doing that, Genger had no reason not to engage the lawyers and K & K. He could have pointed out the problem and sought permission to proceed.

The most natural inference that arises when sophisticated people act secretively in a process that is governed by a court order and that has been placed under the purview of counsel to ensure compliance is that they have something to hide. [*27] In this case, I believe that Genger, with Ohana's advice, felt that there was a chance not only to reduce the risk that his personal information would be misused but also to narrow the information available to TRI in the § 225 action and the other pending cases. In so finding, I am influenced by the incompleteness of the work done by K & K, which did not include imaging the unallocated space. Ohana was involved in the document review process and, while he and Genger were present, none of the review involved the

unallocated space. Moreover, Ohana did not reveal to K & K or Friedman Kaplan that TRI's e-mail server was located off of TRI's premises.

I believe it more likely than not that Ohana (and therefore his client, Genger) knew the unallocated space had not been imaged and knew that it was likely to contain a large amount of information that had not been reviewed that weekend. By having Ohana run SecureClean secretly, Genger would never have to worry about the files contained on the unallocated space. By contrast, if Ohana and Genger raised this issue with Friedman Kaplan and K & K, they would have signaled the existence of the unallocated space and the information on it, thereby [*28] providing another source of documents for the Trump Group and perhaps triggering a deeper inquiry into other sources of TRI information that were available, including the off-site e-mail server.

Given that the only downside of proceeding in an open manner was that Friedman Kaplan and K & K would have been in on the process used to protect any documents made during the encryption process, Genger's behavior is more consistent with a darker intent of getting rid of what he and Ohana thought the lawyers and their consultant did not need to know about. Admittedly, this was a clumsy effort. But tricksters are often ham-handed, and they are not absolved of wrongdoing simply because their improper conduct was not completely effective.

Put simply, I conclude that Genger, upon the advice of Ohana, authorized Ohana to run wiping software with the purpose not only of protecting his non-TRI documents but also of narrowing the information base available to the Trump Group. I cannot and do not conclude that he had any particular piece of information in mind when he made this hurried and ill-advised decision. But I do conclude that he intended to limit the ability of the Trump Group to find additional [*29] documents that might aid it in its litigation battles with him.

D. A Status Conference Is Held To Address, Among Other Things, Genger's Concern About His Personal Documents

On September 12, 2008, this court held a status conference regarding the § 220 and § 225 actions. One concern raised by the Trump Group was that TRI, under Genger's instructions, was not permitting the Trump Group to inspect all of TRI's books and records, some of which Friedman Kaplan had gathered during the September 5 weekend and sent to Dechert's offices for safe-keeping. Another concern the Trump Group raised was that Genger was still acting as a manager, that Genger had "the keys" to TRI, even though the Trump Group purported to have control over TRI. This court responded to both of these concerns by suggesting the parties file an amended status quo order addressing these and other issues.

Additionally, to accommodate Genger's concerns about his personal documents, it was agreed that attorneys from Morris, Nichols, Arsht & Tunnell LLP ("Morris Nichols"), on behalf of TRI, would review both the electronic and hard copies of documents that Friedman Kaplan had gathered during the September 5-7, 2008 weekend, some [*30] of which were being held at Dechert's office. Morris Nichols was to segregate Genger's personal and national security documents from those of his documents that related to TRI's business.

Following the September 12, 2008 status conference, the parties submitted an amended status quo order on September 23, 2008 in which they agreed that Avi Pessolof, William Dowd, Arie Genger, Jules Trump, and Robert Smith would constitute the board of TRI until the § 225 action was resolved. The amended status quo order also provided that the senior management team who was running TRI as of August 25, 2008 would stay in place.

At the September 12, 2008 status conference, Genger's lawyers did not inform the court and the Trump Group about their client's use of wiping software just days before. [27] After the conference, K & K discovered, on its own, that TRI's e-mails were handled by the off-site third-party server maintained by Ohana. [28] On September 23, 2008, K & K made an image of the active files of that third-party e-mail server's hard drive. [29]

> [27] I do not imply that any of Genger's lawyers had been told of the wiping. Of course, if that was the case, it again illustrates Genger's sense of shame over [*31] the conduct.
> [28] JX-7 at P 10 (Leicht Aff. (Oct. 31, 2008)).
> [29] Id. at P 11.

E. Genger's Misconduct Is Discovered And An Expensive Process To Determine What Information Went Missing Is Undertaken

1. The Trump Group Discovers That Files Have Been

Erased From TRI's Computers

Because K & K did not image the unallocated space on the TRI's computers, it is impossible to tell exactly what was erased from the unallocated space. [30] We will never know, to a certainty, what exactly was erased -- precisely because of the use of SecureClean. [31]

> 30  When SecureClean is run on any computer or file, it leaves an electronic "trace," or a type of marker, that the program had been run -- even after using the DeepClean option. FTI found these markers of SecureClean activity on Genger's computer and the TRI server.
> 31  See Tr. at 8:21-9:10 (Faulkner).

The use of SecureClean was discovered by the Trump Group in early October 2008 -- just days after Genger had settled the § 225 action by stipulating to a final judgment that provided for the TRI board of directors to be composed of Eddie Trump, Mark Hirsch, Jules Trump, Robert Smith, William Dowd, and Avi Pelossof, and that effectively ended Genger's managerial role in [*32] TRI. After it assumed control of TRI's offices, the Trump Group employed a computer consultant of its own, FTI Consulting, Inc. ("FTI"). FTI discovered that on September 8 and 10, 2008, SecureClean had been used to "wipe," or permanently overwrite, the unallocated space on a TRI computer and server. [32]

> 32  Tr. at 70:11-22; see JX-10 at P 7; JX-11 at PP 6-8.

Within days of discovering the use of SecureClean, on October 10, 2008 the Trump Group filed a motion to reopen the § 225 case and for an order to show cause as to why Genger should not be held in contempt. [33] In the same general time period, the settlement in the § 225 action unwound and Genger began to again challenge his removal from the TRI board. Eventually, the § 225 action was reopened, and Genger and the Trump Group agreed to seek a determination of who controlled the economic and voting interests in the bloc of shares the Trump Group had bought from the Sagi Genger Trust. The § 225 action was to proceed before other litigation pending among Genger, the Trump Group, and certain other parties in New York, which touched on several of the same issues.

> 33  See Pl.'s Motion To Reopen Case And For

Order To Show Cause Why Arie Genger [*33] Should Not Be Held In Contempt (Oct. 10, 2008).

Genger's destruction of documents, however, created a question about the adequacy of the factual record and what, if any, consequences, should result from his conduct. A great deal of discovery was taken to determine whether any evidence was lost because of Genger's conduct. That discovery included the performance of an analysis by Protiviti Inc., the neutral IT consultant selected by the parties.

## 2. An Important Memorandum Is Not Found On Genger's Computer

Despite these efforts, neither party could definitively answer the question of whether any evidence was lost because no record existed of what was on the unallocated space before the wiping occurred. At trial, one document, known in this case as the "Lentz Memo," [34] took on special importance. That document was authored by David Lentz, of the law firm Lentz & Gengaro LLP, and was sent to Arie Genger, Bill Dowd, and Christopher Gengaro. The memorandum addresses matters directly relevant to the issue of control over certain TRI shares and thus the § 225 action. The document was important to Genger, as evidenced by the fact that he reacted to it by asking Lentz and the other two memo recipients [*34] to convene a meeting the following Monday to discuss the issues covered by the memo. [35]

> 34  JX-9 (memorandum from David Lentz to Arie Genger, William Dowd, and Christopher Gengaro (June 6, 2008)) ("Lentz Memo").
> 35  JX-17 (e-mail from Arie Genger to David Lentz and William Dowd (June 20, 2008)).

Under the protocol established by Ohana for Genger's use and storage of information, Genger should have placed that document on the TRI server in either a personal file, called "P," or a TRI-related file, called "T." In either event, that would have resulted in a copy of the Lenz Memo being saved on the TRI server. When discovery was conducted in this case and when the TRI server was reviewed by FTI and Protiviti, no copy of the version of the Lentz Memo sent to Genger -- or the e-mail to which it was attached -- was found on the TRI server, on Genger's TRI computer, or in Genger's e-mail inbox. Thus, contrary to what was his typical practice, Genger must have deleted this e-mail and the attached document. Had he, however, followed his protocol and

saved a copy of the memo to the T file on the TRI server, a copy of that document would have been on the allocated space of the TRI server. Alternatively, [*35] had he opened and reviewed but not saved the file, it most likely would have been stored on the unallocated space of the TRI server or Genger's computer.

Although one cannot say with certainty what happened to Genger's copy of the Lentz Memo, other than that Genger must have at some point deleted it from his e-mail inbox, it does illustrate the grave doubts that Genger's destructive conduct creates about the integrity of the evidentiary record. At trial, Genger proffered no explanation about what happened to his copy of the Lentz Memo, and whether he deleted it or not. He did not explain whether he followed his typical protocol. All that is known is that his copy is gone from his TRI computer and the TRI server. In his defense, Genger notes that a copy of the Lentz Memo was found on the TRI system in the active files of TRI's then-president, Bill Dowd. But Genger presented no convincing evidence about what happened to his copy of the Lentz Memo, leading me to conclude that he, at some point, deleted it from his work computer at TRI. Even if Genger had deleted the memo from another computer, it would have remained in the "deleted items" folder on his TRI computer unless Genger chose [*36] to empty that file, or until it was overwritten by the computer's natural operating process.

The fact that Genger's copy cannot be found remains important. Different versions of documents or e-mail chains can take on material importance if there are alterations or additions to them. And who received what and when can be crucial. The bottom line is that Genger himself viewed the Lentz Memo as important and yet apparently deleted it from the TRI system at a time when he and the Trump Group were involved in contentious discussions.

The Lentz Memo is not the only document missing from the image of TRI's and Genger's hard drives. After trial, Lentz finally produced documents in connection with his deposition in the § 225 action. 36 In those documents were eight e-mails, some with attachments, that discussed the same subject matter as the Lentz Memo. 37 None of these eight relevant documents were found on Genger's hard drive, even though opening an e-mail and its attachment would have typically created a copy of the documents in the unallocated space on the computer's hard drive. Therefore, it is likely that the

wiping of Genger's hard drive also eliminated these documents.

36    The Trump Group [*37] has moved to supplement the trial record with these documents. The decision whether to allow this evidence is entrusted to my discretion. *In re Transamerica Airlines, Inc., 2008 Del. Ch. LEXIS 27, 2008 WL 509817, at *4 (Del. Ch. Feb, 25, 2008)* ("A motion to supplement the record is addressed to the discretion of the trial court."). For sensible reasons, the admission of late-submitted evidence is not favored, but this is an unusual context. The documents were just produced by Lentz on November 23, 2009, a day before a deposition he gave for the § 225 action. Although Genger claims that the Trump Group could and therefore should have obtained these documents before the contempt trial, the record shows that Genger himself successfully moved to narrow discovery in the contempt action, including raising concerns about the Trump Group's desire to depose and obtain documents from Lentz. *See* Letter from Brian C. Ralston to the Honorable Leo E. Strine, Jr. (Mar. 31, 2009) at 3 (requesting that the court limit discovery of documents to Genger, Ohana, a representative of Friedman Kaplan, and the parties' experts and "opposing [the Trump Group's] motions for commissions to all other witnesses on the grounds that [the [*38] Trump Group] is abusing the discovery process"); *TR Investors, LLC, et al. v. Arie Genger, et al.,* C.A. No. 3994-VCS, at 26 (Del. Ch. Apr. 29, 2009) (TRANSCRIPT) (limiting the number of depositions). That is, Genger discouraged the pre-trial discovery of documents from Lentz that had been sought by the Trump Group. Admittedly, very shortly before trial, Genger changed course and decided to call Lentz as a witness, but that was at a time when the parties were in the last days of preparing for trial. Although Lentz's deposition was taken, he did not produce documents at that time. Only after trial did Lentz, through Genger's own counsel, finally produce documents. Among those documents were communications to Genger that are clearly relevant to the § 225 action and that bear directly on the effect of Genger's destructive conduct

On balance, I find that the interests of justice

are best served by allowing supplementation of the record. Having resisted the broader discovery plan for the contempt action proposed by the Trump Group that would have encompassed discovery of Lentz's documents -- including documents that involved communications between Lentz and Genger himself -- it comes with [*39] ill grace for Genger to complain that he is now confronted with additional documents relevant to the § 225 action that were sent to him by Lentz at TRI and that also cannot be found on the image of the hard drive taken by K & K. Moreover, Genger is well-positioned to show that his copies of these documents are present on the image of his hard drive or TRI's server. There is therefore no prejudice to Genger. That Genger cannot rebut the fact that the documents sent to him are not on either the hard drive or the server does not constitute unfair prejudice justifying keeping this evidence out. Rather, Genger's inability to rebut that fact just demonstrates that additional relevant documents were likely destroyed by his conduct.

37 Pl's Motion to Supplement the Record at Ex. A (e-mail between David Lentz, Arie Genger, William Dowd, and Christopher Gengaro (June 17, 2008)) (discussing the legal restrictions on all Genger trusts and the options available to avoid a legal challenge by Sagi Genger to any sale by one of the trusts to the Trump Group and Genger); *id.* at Ex. B (e-mail between David Lentz, Arie Genger, William Dowd, and Christopher Gengaro (June 26, 2008) (discussing developments [*40] in the discussions with the Trump Group and implications for control of TRI); *id.* at Ex. C (e-mail between David Lentz, Arie Genger, William Dowd, and Christopher Gengaro (July 2, 2008)); *id.* at Ex. D (notes of Chris Gengaro (July 2, 2008)) (describing the termination provisions of a proposed stockholders agreement that was being negotiated); *id.* at Ex. E (e-mail between David Lentz, Arie Genger, and William Dowd (July 9, 2008)) (discussing edits to the language in the proposed stockholders agreement); *id.* at Ex. F (e-mail between David Lentz, William Dowd, Arie Genger, and Christopher Gengaro (June 30, 2008)) (discussing developments in the discussions with the Trump Group and implications for control of TRI); *id.* at Ex. G (notes of meeting between Arie Genger, William

Dowd, David Lentz, and Christopher Gengaro (June 19, 2008)) (discussing financing for TRI and Sagi Genger's strategy); *id.* at Ex. H (notes of meeting between Arie Genger, William Dowd, and Eddie Trump (June 16, 2008)) (discussing strategy for dealing with Sagi Genger Trust in light of proposed financing deal for TRI).

Neither the Trump Group nor the court can do anything but speculate what other documents Genger may [*41] have deleted during this critical time. The absence of large volumes of deletions is, I suppose, of some comfort, but the quality rather than the quantity of deletions matters more. This is particularly the case because Genger was not a routine "deleter" -- he had accumulated thousands of e-mails in his in-box. 38

38 *See TR Investors, LLC v. Arie Genger,* C.A. No. 3994, at 4-8 (Del. Ch. Oct. 26, 2009) (TRANSCRIPT) at 86:6-87:1; JX-19 (expert report of Kevin Faulkner) at 22.

There is no real doubt that the unallocated space of the TRI server contained a large mass of TRI-related information from the months immediately preceding the use of SecureClean which would have included copies of information that had been deleted from the active files of TRI. That large mass would likely have included Genger's copy of the Lentz Memo, the newly discovered documents sent to Genger that addressed the same general subject matter, and other versions of documents Genger had used that involved TRI's business and affairs. Therefore, I conclude that Genger's behavior had the effect of destroying evidence that was likely relevant to the § 225 action in the sense used in the discovery rules.

In reaching that [*42] conclusion, I do not wish to overstate the point. The reality is that K & K did image all of the active files available at TRI. And, as will be discussed, the Trump Group located a back-up tape for TRI that was current as of July 2007, a period fourteen months before SecureClean was run. From those available data sources, the Trump Group has had sufficient information to operate TRI as a business and has been able to collect a very large amount of evidence for trial.

But the reality remains that Genger caused a large data source to be entirely deleted, a data source that would have acted as a back-stop in case relevant evidence had been deleted in the months when the motivation to

delete would have been at a zenith. Genger argues that the loss of any data he deleted from the active files before the August Status Quo Order formally went into effect is irrelevant. That is nonsense. By his improper destruction of the unallocated space, Genger likely destroyed relevant evidence -- including evidence that he deleted during July and August, at times when he realized that litigation was likely and, indeed, when it had already commenced.

F. The Trump Group Assumes Control And Uses TRI's Records

Almost [*43] as soon as the Trump Group assumed control of TRI, it began reviewing documents both for purposes of running TRI and for purposes of litigating against Genger. To both ends, the Trump Group had its consultant, FTI, preserve its own image of Genger's computer and the TRI server. [39] The Trump Group then had another computer consultant, i365, Inc., use that image along with data-building software called MetaLINCS, to create a user-friendly and searchable database, which was designed to help the Trump Group prepare for the § 225 action. [40] But the MetaLINCS database was also used by the Trump Group in their day-to-day operations of TRI. [41]

[39] Id. at 166:14-24 (Hirsch).
[40] See TR Investors, LLC v. Arie Genger, C.A. No. 3994, at 4-8 (Del. Ch. Oct. 26, 2009) (TRANSCRIPT) at 131:12-132:1.
[41] Tr. at 169:5-16 (Hirsch).

In itself, these activities were not problematic. But yet another amended status quo order, created after an argument before this court on December 29, 2008 (the "December Status Quo Order") also contained a provision that stated:

Unless and until otherwise ordered by the Court or agreed to in writing by the parties to the above action, Plaintiffs and their respective officers, directors, [*44] [and] agents . . . shall not cause TRI, Inc. and/or its subsidiaries and affiliates . . . to take any material action that is out of the ordinary course of business, including but not limited to those actions enumerated in subparagraphs 2(i)-2(xii) below, without having first provided to Defendant Arie Genger not less than five (5) business days notice of the proposed action: . . . (xii)

accessing or attempting to access any Genger documents, except in accordance with the protocols outlined by the Court at the December 29 . . . . At the December 29 hearing, the Court outlined the protocols that the parties should follow for reviewing Genger documents at TRI's offices or in electronic files that the Company has sought to access. [42]

In the Standstill Agreement, "Genger documents" had been defined as "[t]he documents, objects, and electronic files stored at [TRI] that Arie Genger contends are solely personal in nature and do not belong to the Company . . . ." [43]

[42] JX-4 (Second Amended Status Quo Order (Dec. 30, 2008)) at PP 2, 8.
[43] See Standstill Agreement.

Inspired in part by a zealous desire to find out exactly what information had been lost by Genger's use of SecureClean, the Trump Group's [*45] general counsel, Mark Hirsch, began working with Sagi Genger to develop information that would be useful to the Trump Group's contempt motion and, more generally, in the litigations involving Genger. To that end, Sagi Genger provided Hirsch with information in Sagi's own possession that Sagi thought would be on the TRI system. That included a document with valuations of some of his father's financial holdings, which did not relate to TRI. [44] On its face, the document appears to have been of the kind that Genger legitimately sought to protect through the encryption process. The parties had agreed in the December Status Quo Order that documents personal to Genger were only to be reviewed in accord with the protocols laid out by this court at the December 29, 2008 hearing.

[44] JX-34 (e-mail from Arie Genger to Dalia Barshishat (Aug. 27, 2004)).

Hirsch took a see no evil, hear no evil approach to his dealings with Sagi. Hirsh did not ask Sagi how he had come into possession of the documents he was turning over to Hirsch and whether Sagi had a legitimate right to their use. [45] Hirsch then took the documents he received from Sagi and searched the MetaLINCS database to see if he could find copies [*46] of them. When he found a different e-mail copy of the document relating to Genger's financial holdings, Hirsch sent it on to Sagi,

who used the version from TRI's database in other, unrelated family litigation against his father. [46] Hirsch says he now "regrets" this action. [47]

> 45  Tr. at 220:9-221:17 (Hirsch).
> 46  Id. at 183:5-184:19, 186:2-8.
> 47  Id. at 186:13-18.

Moreover, when the Trump Group located the TRI Server July 2007 back-up tape in September 2008, it did not disclose that discovery to Genger. The back-up tape was loaded on to the MetaLINCS system in early October 2008. Because the back-up tape was comprehensive, it likely included personal information of Genger's that was unrelated to TRI. But the 2007 back-up tape was not reviewed to segregate (or encrypt) such information and was placed in searchable form on the MetaLINCS system. It was not until May 2009 that a copy of the back-up tape was turned over to Genger's counsel. The production of the tape followed a long period of wrangling between the parties over a host of issues, including whether the Trump Group was being scrupulous in protecting Genger's confidentiality interests in his personal documents.

Although Genger does not [*47] accuse the Trump Group's litigation counsel of recognizing that the 2007 back-up tape could have Genger's confidential, personal information on it, he does accuse the Trump Group of realizing that possibility. In that regard, I do find it likely that Hirsch was aware of the existence of the 2007 back-up tape for months before it was disclosed to Genger's counsel and did not undertake to protect Genger's personal information. In so finding, I do not conclude that Hirsch affirmatively sought to review information personal to Genger. Indeed, I believe it was Hirsch's obsessive focus on finding information relevant to the Trump Group's feud with Genger over TRI and finding information supportive of the Trump Group's contempt motion that led Hirsch to gather as much data as he could.

Nonetheless, Hirsch displayed no concern about whether there was information on the MetaLINCS system that was personal to Genger. Hirsch gave TRI's comptroller, Gail Glazebrook, unfettered access to the MetaLINCS system, including access to the unencrypted information on the July 2008 backup tapes, therefore giving her what she needed if she wished to obtain access to Genger's Israeli national security (and [*48] personal) e-mails. [48] Although the Trump Group claims that it

"self-policed," [49] and I have no reason to believe that Glazebrook had any motive to be interested in Genger's personal affairs, granting someone like Glazebrook unfettered access is not in keeping with protocols discussed during the December hearing and memorialized in the December Status Quo Order, which prohibited "accessing or attempting to access any Genger documents" except in accordance with these protocols. [50]

> 48  Tr. at 228:18-230:13 (Hirsch); Glazebrook Dep. at 158:4-160:14.
> 49  Tr. at 300:23-301:15.
> 50  See Amended Status Quo Order (Sept. 23, 2008).

Genger has asked me to consider, in determining what sanctions, if any, to award, that the Trump Group was less than assiduous in honoring the provisions of the December Status Quo Order that protected his confidentiality interests. I will give appropriate weight to the Trump Group's behavior in fashioning a remedy for Genger's violation of the August Status Quo Order.

III. Legal Analysis

Two claims by the Trump Group were the focus of trial: one alleging contempt of court by Genger; the other alleging spoliation of evidence by Genger. I analyze each claim separately, but I award [*49] one set of sanctions based on my finding that Genger violated the August Status Quo Order because the two separate theories are so closely related.

A. Contempt Of Court

1. This Court Has Broad Power To Sanction For Violation Of Its Orders

[HN1] "To establish civil contempt, [the petitioning party] must demonstrate that the [contemnors] violated an order of this Court of which they had notice and by which they were bound." [51] Court of Chancery Rule 70(b) supplies this court with the power -- and broad latitude -- to remedy violations of its orders. [52] A party petitioning for a finding of contempt bears the burden to show contempt by clear and convincing evidence; the burden then shifts to the contemnors to show why they were unable to comply with the order. [53]

> 51  Arbitrium v. Johnston, 1997 Del. Ch. LEXIS 132, 1997 WL 589030, at *3 (Del. Ch. Sept. 17,

2009); see *City of Wilmington v. Gen. Teamsters Local Union 326, 321 A.2d 123, 125 (Del. 1974)* (explaining that civil contempt actions are "instituted to preserve and enforce the rights of private parties to suits, and to compel obedience to orders and decrees made to enforce the rights and administer the remedies to which the court has found them to be entitled").

52  Ct. Ch. R. 70(b).

53  *State ex rel. Oberly v. Atlas Sanitation Co. Inc., 1988 Del. Ch. LEXIS 112, 1988 WL 88494, at *2 (Del. Ch. Aug. 17, 1988)* [*50] ("[O]nce the party with the burden of proof has introduced evidence from which a fact finder could conclude that he has established a *prima facie* case, then the burden of going forward with the evidence shifts to the alleged contemnor to . . . [show] it was impossible to comply with the court order."); see *Rolex Watch U.S.A., Inc. v. Crowley, 74 F.3d 716, 720 (6th Cir. 1996); F.T.C. v. Affordable Media, 179 F.3d 1228, 1239 (9th Cir. 1999);* see also *AM. JUR. 2D Injunctions § 321.*

In *Gallagher v. Long,* the Delaware Supreme Court stated, [HN2] "[a] trial judge has broad discretion to impose sanctions for failure to abide by its orders," so long as the sanctions are "just and reasonable." 54 *Gallagher* affirmed this court's entry of final judgment on all claims for the plaintiffs after the defendants' continued failure to respond and "willful[ ] and conscious disregard for the Court of Chancery's orders." 55 *Gallagher* did note that the entry of judgment as a consequence is appropriate only where there is "an element of willfulness or conscious disregard of a court order" by a party. 56

54  *940 A.2d 945, 2007 WL 3262150, at *2 (Del. 2007).*

55  *Id.*

56  *Id.*

Finally, [HN3] the purpose of a civil, as opposed to criminal, [*51] contempt determination must be "coercive or remedial." 57 Therefore, an aggrieved party must also show that the sanction desired is coercive or remedial, as opposed to punitive. 58

57  *Del. State Bar Ass'n v. Alexander, 386 A.2d 652, 665 (Del. 1978);* see *Mother African Union First Colored Methodist Protestant Church v. Conference of African Union First Colored Methodist Protestant, 1992 Del. Ch. LEXIS 89,*

1992 WL 83518, at *6 (Del. Ch. Apr. 22, 1992) ("[F]or the plaintiffs to establish a civil contempt, they must show that the defendants violated an order of this court, and that the sanction they seek is coercive or remedial in nature.").

58  See *Del. State Bar Ass'n, 386 A.2d at 665.*

2. Genger Acted In Contempt Of Court By Directing His Agent To Delete Company-Related Documents

The Trump Group has shown, by clear and convincing evidence, that Genger consciously violated the August Status Quo Order, which prohibited him from tampering with or destroying any TRI-related files. Genger was keenly aware of that order, because the presence of Friedman Kaplan during the crucial weekend served as a constant reminder of it. But, once Friedman Kaplan left the scene, Genger and his agent Ohana engaged in a secretive scheme [*52] of document destruction.

By the clear terms of the August Status Quo Order, Genger had no right to make any unilateral decision about the disposition of information belonging to TRI. The order plainly stated that "the parties to the *[§ 225* dispute]* . . . are hereby restrained and enjoined from, directly or indirectly . . . tampering with, destroying or in any way disposing of any Company-related documents." Rather than ask permission from counsel for TRI (or even his own litigation counsel) to destroy the information on TRI's computers, Genger conspired with Ohana to do it secretly, in the dead of night.

Genger's defense to the contempt motion largely involves the notion that he was an innocent who thought he was just disposing of copies. But he did not behave like an innocent. An innocent would have called all the relevant players together and fashioned a legitimate solution to the problem that supposedly inspired Genger and Ohana. Instead, Genger and Ohana acted like sharpies, hoping to take advantage of the incomplete job done by Friedman Kaplan and K & K.

Genger also argues that there is no evidence that any particular documents were lost. But, even if that were true, [HN4] "no harm, no [*53] foul" is not a cognizable defense to a contempt allegation. 59 Earlier this year, in *Triton v. Eastern Shore Electrical Services,* the defendant -- despite a preliminary injunction to refrain from soliciting bids for projects identified in the injunction -- solicited a bid on a project listed in the preliminary

injunction and also did not inform the bidder of the injunction. [60] Vice Chancellor Parsons sanctioned the defendants and noted it was irrelevant that the defendant's solicitation efforts were unsuccessful; contrary to the defendants' assertions that this conduct was just a "comedy of unfortunate circumstances," Vice Chancellor Parsons held that [HN5] violating a court order is a serious matter and one worthy of appropriate sanctions. [61] Therefore, Vice Chancellor Parsons made a finding that the defendant's attempts to circumvent the preliminary injunction undermined his credibility as a witness. [62]

> 59   Triton v. Eastern Shore Electrical Services, Inc., 2009 Del. Ch. LEXIS 88, 2009 WL 1387115, at *6-7 (Del. Ch. May 18, 2009).
> 60   2009 Del. Ch. LEXIS 88, 2009 WL 1387115, at *6-7.
> 61   Id.
> 62   2009 Del. Ch. LEXIS 88, [WL] at *7.

For a party to intentionally violate an order not to destroy or tamper with information and then to claim that he did little harm because no one [*54] can prove how much information he eradicated takes immense chutzpah. For a court to accept such a defense would render the court unable to govern situations like this in the future, as parties would know that they could argue extenuation using the very uncertainty their own misconduct had created.

Moreover, there is evidence that relevant documents have been lost due to Genger's misconduct. It is troubling that the Lentz Memo was not found in Genger's TRI files. And the recently produced documents from Lentz show that Genger likely deleted several other documents relevant to the § 225 action from TRI's hard drive. Copies of those documents would likely have been on the unallocated space if they had not been erased.

Although I have little doubt that Genger and Ohana did not think out their document destruction scheme very well, I have no doubt that Genger knew he was violating this court's order and limiting the Trump Group's ability to obtain access to all the information that would have otherwise been available both as managers of TRI and as litigants in this court and others. Therefore, I find that Genger acted in contempt of court.

B. Spoliation of Evidence

1. An Adverse Inference Sanction [*55] For Spoliation Requires A Finding Of Reckless Or Intentional Spoliation Of Evidence

[HN6] "A party in litigation or who has reason to anticipate litigation has an affirmative duty to preserve evidence that might be relevant to the issues in the lawsuit." [63] Often, this duty attaches even before litigation has been commenced "when a party should have known that the evidence may be relevant to future litigation." [64] A party does not, however, have a duty to "preserve every shred of paper, every e-mail or electronic document," but instead must "preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." [65]

> 63   Beard Research v. Kates, 981 A.2d 1175, 1185 (Del. Ch. May 29, 2009).
> 64   Acierno v. Goldstein, 2005 Del. Ch. LEXIS 176, 2005 WL 3111993, at *6 (Del. Ch. 2005) (quoting Zubulake v. UBS Warburg, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)); see also Triton, 2009 Del. Ch. LEXIS 88, 2009 WL 1387115, at *8 ("An affirmative duty to preserve evidence attaches upon discovery of facts and circumstances that would lead to a conclusion that litigation is imminent [*56] or should be otherwise expected.").
> 65   Zubulake, 220 F.R.D. at 217; see also In re Wechsler, 121 F. Supp. 2d 404, 420 (D. Del. 2000) ("[T]he scope of the duty to preserve evidence is not boundless. However, . . . a party still must act reasonably under the circumstances.").

[HN7] Dispositive sanctions, including dismissal of claims or imposition of an adverse inference, are only appropriate where a party acts to "intentionally or recklessly destroy evidence, when it knows that the item in question is relevant to a legal dispute or it was otherwise under a legal duty to preserve the item." [66] Delaware courts have defined recklessness in the spoliation context as a conscious awareness of the risk that one's action or inaction may cause evidence to be despoiled. [67] Intentional destruction simply means that the spoliator acted "with purpose." [68]

> 66   Sears, Roebuck & Co. v. Midcap, 893 A.2d

*542, 552 (Del. 2006)* (emphasis added); *see also Beard Research, 981 A.2d at 1192* ("[D]rawing an adverse inference is appropriate when an actor is under a duty to preserve evidence and takes part in the destruction of evidence while being consciously aware of a risk that he or she will cause or allow evidence to [*57] be spoiled by action or inaction . . . .").

67 *Beard Research, 981 A.2d at 1192* ("Reckless conduct reflects a *knowing disregard* of a substantial and unjustifiable risk. It amounts to an 'I don't care attitude.'").

68 *Id. at 1191* (citing BLACK'S LAW DICTIONARY 826 (8th ed. 2004) (defining "intentional" as "[d]one with the aim of carrying out the act")).

Additionally, to obtain an adverse inference, the aggrieved party must make some showing that the allegedly destroyed evidence existed and supported the aggrieved party's position. 69 If a party intentionally destroys evidence, then a court must "adopt a view of the facts as unfavorable to the wrongdoer as the known circumstances will reasonably admit." 70

69 *Beard Research, 981 A.2d at 1193* ("[A] party must offer more than mere speculation and conjecture that a particular document existed."); cf. *AM. JUR. 2D Trial § 1100* ("A [party] must show that the lost or destroyed evidence would have played a significant role in his or her [case] and that comparable evidence could not be obtained elsewhere.").

70 *Equitable Trust Co. v. Gallagher, 34 Del. Ch. 249, 102 A.2d 538, 541 (Del. 1954).*

2. Genger Committed Spoliation Of Evidence

Here, a finding of intentional spoliation [*58] is made easier by the reality that Genger was under a clear duty to preserve evidence because of: (1) the ongoing litigation between Genger and the Trump Group, and (2) the clear language of the August Status Quo Order. This is not a situation where a party is accused of having committed spoliation by destroying business records before there was any hint that litigation would arise that may implicate the affected records. 71 Rather, in this case, Genger was clearly aware of his affirmative duty to preserve evidence that might be relevant to the issues in the § 225 action and other pending cases. 72 Moreover, as indicated earlier, I find that Genger and Ohana believed

that their conduct would limit the information base the Trump Group would have to use in the pending litigation. Therefore, I conclude that Genger intentionally despoiled evidence.

71 In *Midcap v. Sears, Roebuck and Co.,* for example, Sears was unable to produce documents about who had delivered and installed a gas range in 1994, which was claimed to have caused a gas explosion in 1999. *2004 Del. Super. LEXIS 218 , 2004 WL 1588329, at *1 (Del. Super. May 26, 2004), rev'd, 893 A.2d 542 (Del. 2006).* Although Sears had disposed of the documents five years [*59] before it had any reason to anticipate litigation, the jury was improperly instructed that it may draw an adverse inference from Sears' loss of the documents without any finding that Sears had acted intentionally or recklessly to despoil evidence. *Sears, 893 A.2d at 547* (describing the adverse jury instruction, which did not require the jury to find that Sears had acted intentionally or recklessly in failing to retain documents, and finding the instruction to be reversible error).

72 *See* JX-2 (Status Quo Order (Aug. 29, 2008)).

In any event, at the very least Genger acted recklessly. If it was not reckless for Genger secretly to cause Ohana to wipe the unallocated space of TRI's server clean when he could have called Friedman Kaplan and gotten their view of whether that was permissible, it is hard to say what would be reckless. Even if Genger did not act with a malevolent intent to limit the universe of evidence available to the Trump Group, he was certainly reckless in charging Ohana to erase all the information of the unallocated space of TRI's computer system in the face of pending litigation and a judicial order not to destroy or tamper with TRI's information. If Genger believes that [*60] running wiping software without advice of counsel or court permission in this context does not constitute recklessness, he has an unusual dictionary. The law uses a more traditional lexicon.

Of course, the Trump Group as the moving party is required to point to specific documents that existed and would have supported its position but for Genger's actions. 73 As discussed previously, the Trump Group has shown that, but for Genger's destructive conduct, Genger's copies of the Lentz Memo and other recently identified documents also relevant to the § 225 action would have been on the unallocated space of TRI's

computer system. Anyone experienced in litigation realizes that different versions of the same document can affect a case materially, and Genger has left the Trump Group without versions of important documents. These are just the *known* effects of Genger's wholesale deletion. It is likely that other relevant information was also lost. Therefore, the Trump Group has met its burden to show that Genger destroyed information that would have helped it in the § 225 action.

> 73  *See In re Daimler Chrysler AG, 2003 U.S. Dist. LEXIS 27720, 2003 WL 22951696, at * 2 (D. Del. Nov. 25, 2003)* (explaining that, to support an adverse [*61] inference sanction for spoliation, the aggrieved party "must show 'a reasonable possibility, based on concrete evidence rather than a fertile imagination' that access to the lost material would have produced evidence favorable to his cause") (quoting *Gates Rubber Co. v. Bando Chem. Indus., Ltd., 167 F.R.D. 90, 104 (D. Colo. 1996)*).

VI.  Stringent, But Not Ultimate, Sanctions Are Appropriate And Provide A Fair Remedy

The remedial inquiries relevant to the contempt and spoliation claims are similar. [HN8] A court has inherent power to fashion a remedy for contempt that is proportionate to the level of harm committed so long as the court exercises restraint. [74] In determining what remedy to award for spoliation, the court should consider: (1) the culpability of the spoliating party; (2) the degree of prejudice suffered by the aggrieved party; and (3) the availability of lesser sanctions that could both avoid unfairness to the aggrieved party and serve as an adequate penalty to deter such future conduct. [75]

> 74  *See Gallagher, 940 A.2d at 945* (explaining that a trial judge must only impose sanctions for civil contempt that are "just and reasonable"); *see also Am. JUR. 2D Contempt § 195* ("Courts have [*62] the inherent power to enforce compliance with their lawful orders . . . [but] . . . [i]n selecting contempt sanctions, a court is obligated to use the least possible power adequate to the end proposed."); *cf. State ex rel. Oberly v. Atlas Sanitation Co., Inc., 1988 Del. Ch. LEXIS 112, 1988 WL 88494, at *3 (Del. Ch. Aug. 17, 1988)* (explaining that "the inadvertence of the violation [of a court order] may be taken into account in fashioning a remedy").

> 75  *Beard Research, 981 A.2d at 1189* (citing *Positran Mfg., Inc. v. Diebold, Inc., 2003 U.S. Dist. LEXIS 8114, 2003 WL 21104954, at *2 (D. Del. May 15, 2003))*.

Here, these standards guide my determination to put in place a stringent remedy, but one that is short of a default judgment. First, although I believe that Genger was improperly motivated and intended to limit the Trump Group's ability to gather evidence in its disputes with him, I also accept that part of his motivation was to protect his confidentiality interests in his personal information. In accepting this as part of his motivation, I do not retract my finding that Genger acted intentionally and was motivated by a desire to limit the Trump Group's access to a valuable source of additional information in the § 225 action.

Second, [*63] I find that the Trump Group did not suffer a high degree of prejudice because Genger's misconduct only affected the unallocated space on his computer and TRI's server, while the active files, which were not deleted, contained a good deal of relevant information. Additionally, I give weight to the Trump Group's own conduct in failing to take reasonable steps to protect Genger's personal information once it assumed control of TRI. Although that conduct is not sufficiently egregious to warrant denying TRI any relief, I do believe it is relevant in deciding to deny it a default judgment.

Third, I find that the extreme remedy of a default judgment is not appropriate to remedy any unfairness to the Trump Group because lesser available sanctions provide an adequate remedy. Given the law's preference for an adjudication on the merits where possible, [76] I think a stringent remedy that directly relates to the effects of Genger's misconduct is most fitting. Such a remedy will deprive Genger of the advantages of any evidentiary gaps that his own misbehavior might have been caused.

> 76  *See 2003 U.S. Dist. LEXIS 8114, [WL] at *10* (holding that entering a default judgment "should be regarded as a last resort") (internal citations [*64] omitted); *see also Beckett v. Beebe Med. Ctr., Inc., 897 A.2d 753, 757-58 (Del. 2006)* ("Courts should apply rules with a liberal construction because of the underlying public policy that favors a trial on the merits, as distinguished from a judgment based on a default.") (internal citations omitted).

That remedy will have the following elements. First, because Genger has diminished the evidence base that would otherwise be available to the Trump Group, I conclude that he must produce relevant documents to which he may have otherwise made a claim of privilege. [77] I have previously held that Genger waived his attorney-client privilege with respect to the Lentz Memorandum because TRI paid Lentz to prepare the memorandum, which was shared with TRI's then-president, Dowd. [78] As a partial remedy for Genger's conduct, I hereby hold that Genger must allow the Trump Group access to ten of the remaining "disputed documents" discussed in the parties' briefs in support of, and opposing, the Trump Group's motion for a protective order. [79]

[77] I specifically do not waive Genger's privilege claims with respect to a document described in Genger's Privilege Log as a "Handwritten markup of draft complaint [*65] regarding Genger matrimonial dispute." This document is irrelevant to this dispute. This document was identified in the parties' briefs on the Motion for Protective Order as Document No. 13, bearing Bates No. TRI INV 00017686-17701.

[78] *TR Investors, LLC v. Arie Genger,* C.A. No. 3994, at 4-8 (Del. Ch. Sept. 18, 2009) (TRANSCRIPT).

[79] *See* Pl.'s Op. Br. in Supp. of Motion for Protective Order at 26-33; Def.'s Ans. Br. in Opp. to Pl.'s Motion for Protective Order at 7-14. The disputed documents are identified as Document Nos. 3 through 10, No. 12, and No. 14. These documents were identified in both parties' briefs as those documents bearing Bates numbers: TR INV 00022041-22043; TR INV 00017721; TRI INV 00048830-48832; TRI INV 00048833-48834; TRI INV 0004890-48909; TRI INV 00048917; TRI INV 00048930; TRI INV 00048974; TRI INV 00049062; and TR INV 00017702-17708. Genger has withdrawn his claim of privilege on Document Nos. 1 (Bates No. TR INV 00049045), 11 (Bates No. TR INV 00048941), and a single page of notes related to

the September 2008 board letter (Bates No. TR INV 00048944). Therefore, I do not address these documents.

Second, I elevate by one level the burden of persuasion upon Genger [*66] to prevail on any affirmative defense or counter-claim that he has raised in the *§ 225* action. By way of example, if Genger would have to prevail only by a preponderance of the evidence, he will have to prevail at trial by producing clear and convincing evidence. Additionally, because Genger's conduct leaves me with severe doubts about his credibility, Genger will be unable to prevail on any material factual issue if the only evidence in support of his position is his own testimony. Absent corroborating testimony or documents, his mere word will be insufficient to meet his burden of persuasion.

Finally, because Genger's misconduct has occasioned great expense, I award the Trump Group their reasonable attorneys' fees and expenses related to the motions for contempt and spoliation. Because the parties have shown a propensity to fight about everything and because there is reason to believe that the Trump Group (and Genger himself) engaged in a bit of overkill in litigating these motions, I suggest an award of $ 750,000 to be reasonable in the first instance and in the hopes that the parties can live with that figure and avoid additional litigation costs. If the [*67] parties decide to haggle over that amount, the parties shall exchange information about their respective attorneys' fees and costs in connection with the contempt and spoliation motions and attempt to reach accord in good faith. If no accord is reached, I shall appoint a special master who will address the fee dispute, with the costs of the master being charged in full against the party whose position as to the amount deviates the most from the final amount awarded by the court.

## V. Conclusion

For all these reasons, the Trump Group's motion for contempt and motion for spoliation is hereby granted and the Trump Group shall file an implementing order, upon notice as to form, within five days.